UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                          Chapter 11 Cases
                                                Case No. 08-10928-BKC-JKO
TOUSA, Inc., *et al.,*                          (Jointly Administered)

            Debtors.
_____/

TOUSA, Inc., *et al.*,                          Adv. No. 09-02281-BKC-JKO

            Plaintiffs,
vs.

Federal Insurance Company, *et al.,*

            Defendants.
_____/

**MOVING INSURERS' EXPEDITED JOINT MOTION
TO WITHDRAW THE REFERENCE**

Defendants XL Specialty Insurance Company, Federal Insurance Company, National

Union Fire Company of Pittsburgh, Pa., Zurich American Insurance Company, Westchester Fire

Insurance Company, St. Paul Mercury Insurance Company (incorrectly named herein as St. Paul

Travelers Co., Inc.), AXIS Reinsurance Company, RSUI Indemnity Company, Arch Insurance

Company, Allied World Assurance Company, and Beazley Insurance Company, Inc. (the

"Moving Insurers"), by and through their respective undersigned counsel, move for an expedited

order of the United States District Court for the Southern District of Florida (the "District

Court"), immediately withdrawing the reference of this adversary proceeding to the United

States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court"), in

accordance with 28 U.S.C. § 157(d), Rule 5011(a) of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), and Rule 5011-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of Florida (the "Local Rules").

The legal and factual bases of the motion are outlined in the Memorandum of Law below.

## PRELIMINARY STATEMENT

In this action, the TOUSA debtors [1]/ seek insurance coverage for the costs of defending an underlying lawsuit filed against certain of their current and former directors (the "Director Defendants") by the Committee of Unsecured Creditors and by the TOUSA subsidiary debtors (the "Underlying Action").

The TOUSA debtors' instant complaint names twelve different insurance companies as defendants, and seeks a declaration of coverage under all of the policies at issue. The complaint also alleges claims for breach of contract under the primary insurance policies. All of the insurance policies in dispute were issued before the TOUSA debtors filed for bankruptcy. As such, this action is a straightforward contract dispute. It does not involve any substantive rights arising under bankruptcy law, and certainly could have arisen outside the context of a bankruptcy. Directors & Officers insurance coverage actions, such as this one, are heard and decided by non-bankruptcy courts every day. Thus, this adversary proceeding presents a quintessential non-core matter under the applicable jurisdictional statutes, and "cause," therefore, clearly exists for withdrawing the reference of this action pursuant to 28 U.S.C. § 157(d).

Further, as outlined in the Moving Insurers' pending motions to dismiss, filed contemporaneously with this motion, the TOUSA debtors do not even have standing to pursue

---

[1]/    As used herein, the term "TOUSA" shall refer to TOUSA, Inc. The term "TOUSA subsidiary debtors" shall refer to the remaining plaintiffs in this action, which upon information and belief are all subsidiaries of TOUSA. The term "TOUSA debtors" shall refer collectively to TOUSA and the TOUSA subsidiary debtors.

this action in the first place.  Rather, this action should have been brought (if at all) by the Director Defendants.  These Director Defendants are the only insureds who are alleged to have suffered any "loss" under the applicable insurance policies.  Had the case been brought by the proper parties – the non-debtor Director Defendants – the matter clearly would not bear any connection at all to the TOUSA bankruptcy, much less constitute a core matter.  The mere fact that the TOUSA debtors – and not the Director Defendants – brought this action does not change the fact that this action is a coverage dispute and nothing more.  The case law discussed below is uniform in holding that insurance coverage disputes, such as this one, are non-core matters.

The other factors relevant to the Court's analysis of cause for withdrawal – including the goals of judicial economy and efficiency, and the uniform administration of the bankruptcy law – likewise favor withdrawing the reference.  *See, e.g., Control Center*, *L.L.C. v. Lauer*, 288 B.R. 269, 274 (M.D. Fla. 2002) (citing *In re Simmons*, 200 F.3d 738, 742 (11th Cir. 2000)).  Specifically, the Bankruptcy Court does not have the authority  in non-core matters to issue final orders and judgments.  If this adversary proceeding is initially heard in the Bankruptcy Court, pursuant to 28 U.S.C. § 157(c)(1), the Bankruptcy Court only would be empowered to issue proposed findings and conclusions.  Those proposed findings/conclusions would still need to be reviewed *de novo* by the District Court.  This procedure would add an unnecessary layer of proceedings and unduly increase the costs to all litigants, including the Debtor.  A determination of non-core status, therefore, heavily militates in favor of withdrawal of the reference.

Because this action raises only questions of state insurance law and contract interpretation, the legal and factual issues presented by the action do not require the specialized statutory and procedural knowledge and expertise of a Bankruptcy Judge.  Instead, the case presents typical common-law claims within the knowledge and expertise of a District Judge.

There is simply nothing to be gained by leaving in place the judicially inefficient and costly reference to the Bankruptcy Court.

In addition to those factors – which on their own plainly warrant the granting of this motion – the grounds for withdrawing the reference are particularly compelling in this case. Here, the Moving Insurers are entitled under the Seventh Amendment to a jury trial before the District Court. The adversary complaint seeks to enforce a contract of insurance, and it is well settled that such contract claims sound in law, not equity. Thus, the Moving Insurers are constitutionally entitled to a trial by a jury. Consequently, certain of the Moving Insurers have, herewith, demanded trial by jury. The Moving Insurers do not consent to a jury trial or entry of final orders or judgments in the Bankruptcy Court, as is their right pursuant to 28 U.S.C. § 157(c)(2) and (e).

Absent such consent, § 157(e) expressly requires that the trial be held in the District Court. Thus, because it is clear that this action will ultimately move to the District Court, the reference should be withdrawn now, rather than later, in order to prevent needless duplication and wasted resources by the parties and the Courts. Accordingly, the motion to withdraw the reference should be granted.

## EXIGENT CIRCUMSTANCES

This motion is made on an expedited basis due to the exigencies presented by the ongoing proceedings in the Bankruptcy Court. As detailed in this motion, the District Court, not the Bankruptcy Court, is the appropriate court to hear this matter. For the reasons stated in this motion, the District Court should have the opportunity to decide any case dispositve motions.

As mentioned above, simultaneously with the filing of this motion, the Moving Insurers have moved to dismiss this action.[2]/ Moreover, in a hearing on December 4, 2009 on a motion to stay the Underlying Action, Plaintiffs indicated that they plan to file case dispositive motions in this action by the end of December 2009 or early January 2010. *See* Transcript of December 4, 2009 Hearing at p. 42, attached hereto as Ex. 2. At that same hearing Bankruptcy Court Judge Olson set January 29, 2010 "for argument on any motions that [the Plaintiff] may file in the coverage litigation," even though these motions have not been identified, let alone made, by the Plaintiffs. *Id.* at 45. As things currently stand, therefore, there will be considerable briefing, hearings, and other activity in the Bankruptcy Court in January. However, until this motion is decided, the Bankruptcy Court will not even know whether it is to rule on those motions or whether any such ruling would be final or merely a report and recommendation subject to *de novo* review.

Thus, in the interests of judicial economy, and so that the District Court – the court that has the proper authority to hear this matter – has the opportunity to hear case dispositive motions which currently are scheduled to be heard by the Bankruptcy Court on January 29, 2010, the Moving Insurers respectfully request that this motion be considered on an expedited basis.

---

[2]/    It should be noted that Plaintiffs filed the instant action on November 5, 2009, and summons were issued on November 6, 2009. On Friday November 20, 2009 counsel for XL telephonically requested from Counsel for Plaintiffs a three-week enlargement of time to respond, and explained that counsel for several of the excess insurance carriers involved had also indicated in communications with counsel for XL that they had just been retained and needed more time to respond, and that coordination was appropriate given the complexity of the case and would serve judicial efficiency. Plaintiff granted Defendants a two day extension of time to respond. Therefore, on November 24, 2009, XL moved the court for an extension of time to answer or otherwise respond to the complaint until December 18, 2009, which was joined by many of the insurers, but opposed by the Plaintiffs. On December 1, 2009, Bankruptcy Court Judge Olson held a hearing on the motion for the extension of time, and ultimately denied in part and granted in part the insurer's motion, and granted an extension of time to answer or otherwise respond to the complaint to December 11, 2008. *See* Transcript of December 1, 2009 Hearing, attached hereto as Ex. 1.

## FACTUAL BACKGROUND

### I.    THE POLICIES

Defendant Federal Insurance Company ("Federal") issued Policy No. 8181-4693 (the "Policy") for the Policy Period [3]/ December 15, 2005 to December 15, 2006. *See* Compl., Ex. A. Subject to various terms, conditions and limitations, the Policy was issued on a "claims-made" basis, meaning that it only provides coverage for Claims "first made" against Insureds during the Policy Period. *See id.* at Declarations Page. The term "Insured" is defined to include any Organization as well as any Insured Person. *Id* at Definitions. The term Organization is defined to include TOUSA and its subsidiaries, which include the TOUSA debtor subsidiaries, and the term Insured Person is defined to include officers and directors of any Organization. *Id.* According to the Complaint, plaintiffs also purchased six additional insurance policies for the December 15, 2005 to December 15, 2006 period, which provided coverage that was "excess" to that provided by the Federal Policy (collectively with the Federal Policy, the "2005-06 Tower"). *See* Compl., ¶ 10

Defendant XL Specialty Insurance Company ("XL") issued a policy for the subsequent period of December 15, 2006 to December 15, 2009. *See* Compl., ¶11. Similar to the Federal Policy, the XL Policy extended coverage for claims made against TOUSA and its subsidiaries as well as directors and officers of those entities. *See, generally*, Compl., Ex. C. Plaintiffs alleged that they also purchased eight additional insurance policies that provided coverage that was "excess" to that provided by the XL Policy (collectively with the XL Policy, the "2006-09 Tower"). *Id.*

---

[3]/    Capitalized terms that are not separately defined in this motion are defined terms in the respective Policy to which they refer.

## II.   THE UNDERLYING ACTION

On January 29, 2008, the TOUSA debtors filed for chapter 11 bankruptcy in Bankruptcy

Court for the Southern District of Florida. *See* Compl. ¶ 34. More than one year later, on June 9,

2009, the Committee of Unsecured Creditors of TOUSA, Inc. and the TOUSA subsidiary debtors

commenced an adversary proceeding in this court styled *Official Committee of Unsecured*

*Creditors of TOUSA, Inc. et al. v. Technical Olympic, S.A. et al.*, Adv. Pro. No. 09-01616-JKO

(the "Underlying Action") [Compl., Ex. E]. The complaint in the Underlying Action names as

defendants 19 current and former directors, the Director Defendants, of the TOUSA debtors. *See*

*generally id.* [4]/ The complaint in the Underlying Action alleges that the Director Defendants

engaged in certain acts that constituted a breach of their fiduciary duties to the TOUSA

subsidiary debtors.

Notably, the Underlying Action does not name any of the TOUSA debtors as defendants.

Instead, the Underlying Action is expressly brought by and "on behalf of" the TOUSA

subsidiary debtors, who are named as plaintiffs in the case. *See id.* at pp. 1-2.

The Underlying Action was submitted for coverage under the Federal and XL Policies.

Federal and XL both denied coverage, on the grounds that the Underlying Action was precluded

from coverage pursuant to numerous terms, conditions and limitations in their respective

policies. *See* Compl. at Exs. I-L. The exact nature and basis of the insurers' denial is, of course,

not an issue in this motion to withdraw, but it is clear that the propriety of such denials is a

matter of state contract and insurance law.

---

[4]/      It also names Technical Olympic, S.A. ("Tech S.A.") as a defendant. The claims
asserted against Tech S.A. are irrelevant to this case because the TOUSA debtors do not allege in
their Complaint that Tech S.A. is covered under the Policy.

### III.    THE ADVERSARY PROCEEDING

The TOUSA debtors (but not the Director Defendants) commenced the instant adversary proceeding in the Bankruptcy Court for the Southern District of Florida on November 5, 2009. The Complaint names Federal, XL and the "excess" insurers as defendants.  The Complaint seeks coverage for the defense of the Underlying Action and to recover as "damages" the defense costs incurred in connection with the Underlying Action.  It does *not* allege that any of the TOUSA debtors have been named as defendants in the Underlying Action *nor* that they have incurred or will incur defense costs in connection with that case.

The Complaint contains two counts for declaratory relief, which seek declarations that "the Director Defendants . . . are entitled to coverage for" the defense costs incurred in the Underlying Action under the Federal and XL Policies.  Compl. at Counts I, II.  The Complaint also alleges two counts for breach of contract – one against Federal and one against XL – which alleges that each carrier breached its respective policies by denying coverage for the defense of the Underlying Action.  *Id.* at Counts III & IV.  Finally, the Complaint alleges claims against XL and Federal for attorneys' fees based on their allegedly wrongful refusal "to advance defense costs to the directors and officers for their defense" in the Underlying Action.  *Id.* ¶ 112.

Along with the filing of this motion, the defendant insurers are filing motions to dismiss the Complaint, on the grounds that TOUSA and its subsidiaries lack standing to bring this action because they have not suffered an "injury in fact" in connection with the defense of the Underlying Action.  Instead, this action can be brought (if at all) only by the Director Defendants, who are the only Insureds who have or will suffer any Loss as a result of the Underlying Action.

The Moving Insurers are also moving to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(6) and Fed.R. Bankr. P. 7012(b) because it fails to state a claim for which the TOUSA debtors – the sole plaintiffs in this action – are entitled to relief.  As the motions to dismiss explain, dismissal for failure to state a claim upon which relief can be granted is appropriate because no claim has been made against the TOUSA debtors and because they have not granted indemnification to the directors.  Thus, the TOUSA debtors simply have no basis for seeking coverage under the terms of the insurance policies at issue.

One of the motions to dismiss also argues that the complaint should be dismissed pursuant to Fed.R.Civ.P. 12(b)(7) and Fed.R. Bankr. P. 7012(b) for failure to join all necessary and indispensable parties, and argues that at the very least that the Director Defendants are necessary and indispensable parties who must be joined.

Along with this motion to withdraw the reference, the Moving Insurers are filing a motion stay the proceedings in the Bankruptcy Court.  Resolution of the dismissal motions is properly deferred until the threshold issue of the reference is determined.

Certain of the Moving Insurers have also simultaneously with the filing of this motion filed a demand for a jury trial.

**ARGUMENT**

I.   **STANDARDS GOVERNING PERMISSIVE
     WITHDRAWAL OF THE REFERENCE**

It is well settled that district courts have original jurisdiction over all bankruptcy cases and all civil proceedings "arising under title 11," or "arising in or related to cases under title 11." 28 U.S.C. §§ 1334(a - b).  Because some aspects of a bankruptcy require the adjudication of traditional legal disputes, the judicial power of the Untied States under Article III of the Constitution is implicated.  However, other aspects of bankruptcies only raise issues that involve

9

the administration of the bankruptcy estate or the discharge of indebtedness.  As to those "core"

aspects of the bankruptcy, the Supreme Court has held that the bankruptcy power, given to

Congress under Article I, allows Congress to establish a non-Article III system for resolution.

On the other hand, as to the non-core matters, the Bankruptcy Court, as a non-Article III court

cannot constitutionally render a final adjudication.  *See, generally*, *Northern Pipeline Constr. Co.*

*Marathon Pipe Line Co.*, 458 U.S. 50 (1982).

To reconcile this constitutionally-based jurisdictional split, Congress has established a

two-tiered system.  Jurisdiction over the entire bankruptcy is initially given to the Article III

district courts.  But, by statute, a district court may refer bankruptcy matters to bankruptcy judges

for the district under 28 U.S.C. § 157(a).  This district has done so through Local Rule 87.2.

However, the same statute that allows such referrals also preserves the constitutional limits on

the power of the non-Article III bankruptcy courts.

Specifically, the statute allows the bankruptcy courts to issue final rulings as to core

matters, subject only to appellate review by the district courts.  As to non-core matters, however,

the bankruptcy courts are permitted only to submit proposed findings of fact and conclusions of

law, subject to *de novo* review by the district courts.  28 U.S.C. § 157(c)(1).  Moreover, where

the right to trial by jury exists, the bankruptcy courts can only try the matter if all of the parties

consent.  28 U.S.C. § 157(e).

Thus, although, this matter was automatically initially referred to the Bankruptcy Court,

the District Court retains the power, and in appropriate circumstances, the duty, to withdraw the

reference:

> The district court may withdraw, in whole or in part, any case or proceeding
> referred under this section, on its own motion or on timely motion of any party,
> for cause shown.

28 U.S.C. § 157(d).

Pursuant to 28 U.S.C. § 157(d), therefore, this Court has the authority to withdraw the reference to the bankruptcy court "for cause shown." "[W]hen making a determination of whether sufficient cause exists," to withdraw the reference, "a district court should consider the advancement of uniformity in bankruptcy administration, decreasing forum shopping and confusion, promoting the economical use of the parties' resources, and facilitating the bankruptcy process." *Control Center, L.L.C. v. Lauer*, 288 B.R. 269, 274 (M.D. Fla. 2002) (citing *In re Simmons*, 200 F.3d 738, 742 (11th Cir. 2000)). "Additional factors include: (1) whether the claim is core or non-core; (2) efficient use of judicial resources; (3) a jury demand; and (4) prevention of delay." *Id.* "If one or more of these factors is present, the court may find that cause exists to withdraw the reference." *U.S. v. Kaplan*, 146 B.R. 500, 504 (D. Mass. 1992).

Although such factors are important to consider, the Eleventh Circuit has also made clear that none of them should be interpreted to prevent the district court "from properly withdrawing reference either to ensure that the judicial power of the United States is exercised by an Article III court or in order to fulfill its supervisory function over the bankruptcy courts." *In re Parklane/Atlanta Joint Venture*, 927 F.2d 532, 538 (11th Cir. 1991).

Of the factors noted above, the determination that a matter is "non-core" is of critical importance. "A district court considering whether to withdraw the reference should *first evaluate* whether the claim is core or non-core, since it is upon this issue that questions of efficiency and uniformity will turn." *In re Orion Pictures Corp.*, 4 F.3d 1095, 1101 (2nd Cir. 1993) (emphasis added); *see also Security Farms v. Int'l Broth. of Teamsters, Chauffers*, 124 F.3d 999 (9th Cir. 1997). As explained by one Florida federal court, because "a district court is obligated to review de novo the findings of a bankruptcy court on non-core matters, a

determination that a proceeding is non-core weighs in favor of transferring the matter to a district court." *Control Center*, 288 B.R. at 275; *see also Orion Pictures*, 4 F.3d at 1101 (same).

This insurance coverage action is without question a "non-core" matter. Furthermore, because this matter is non-core, the other factors cited above – including the efficient use of judicial resources and the prevention of delay – clearly weigh heavily in favor of withdrawing the reference.

Finally, courts have held that the existence of a right to a jury trial alone constitutes cause for withdrawing the reference, because bankruptcy courts do not have authority to conduct jury trials absent the parties' consent. 28 U.S.C. § 157(e). *See, e.g., In re Orion*, 4 F.3d at 1101 ("If a case is non-core and a jury demand has been filed, a district court might find that the inability of the bankruptcy court to hold the trial constitutes cause to withdraw the reference."); *131 Liquidating Corp. v. LaSalle Capital Group, Inc. (In re 131 Liquidating Corp.)*, 222 B.R. 209, 211 (S.D.N.Y. 1998) (same). Thus, because the Moving Insurers are constitutionally entitled to a jury trial and certain of the Moving Insurers have demanded a jury trial in this action, it is clearly appropriate to remove this matter to District Court at this time. Accordingly, the motion to withdraw the reference should be granted.

## II.    THE ADVERSARY PROCEEDING IS A NON-CORE DISPUTE

The Bankruptcy Code provides a non-exclusive list of core proceedings. *See* 28 U.S.C. § 157(b)(2)(A)-(P). The TOUSA debtors' Complaint – which seeks a declaration of insurance coverage for the defense costs incurred by the Director Defendants in the Underlying Action and

alleges a claim for breach of contract against certain of the insurers based on their denial of such coverage – clearly does not does not fall within any of the listed proceedings. [5/]

Because this action does not fall within any of the expressly enumerated examples of "core proceedings" in 28 U.S.C. § 157(b)(2), the Court "must inquire as to the nature of a core versus a non-core proceeding." *In re Elect. Mach. Enters.*, 479 F.3d 791, 797 (11th Cir. 2007). The Eleventh Circuit has held that "if the proceeding involves a right created by the federal bankruptcy law, it is a core proceeding.'" *Cont'l Nat'l Bank v. Sanchez (In re Toledo)*, 170 F.3d 1340, 1348 (11th Cir. 1999) (quoting *Wood v. Wood*, 825 F.2d 90. 97 (5th Cir. 1987)). A proceeding is also considered core " '[i]f the proceeding is one that would arise only in bankruptcy.' " *Id.* However, a proceeding is *not* core "'[if] the proceeding does not invoke a substantive right created by the federal bankruptcy law and is one that could exist outside of bankruptcy.'" *Id.*

There is no question that the claims in this action do not "involve[] rights created by federal bankruptcy law." *See, e.g., Sphinx Intern., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.* 412 F.3d 1224, 1227 (11th Cir. 2005) (holding in a case involving directors and officers insurance coverage that the "construction of insurance contracts is governed by

---

[5/]   Proceedings expressly identified as "core" in 28 U.S.C. § 157(b) include: (a) "matters concerning the administration of the estate"; (b) "allowance or disallowance of claims against the estate or exemptions from property of the estate"; (c) "counterclaims by the estate against persons filing claims against the estate"; (d) "orders in respect to obtaining credit"; (e) "orders to turn over property of the estate"; (f) "proceedings to determine, avoid, or recover preferences"; (g) "motions to terminate, annul, or modify the automatic stay"; (h) "proceedings to determine, avoid, or recover fraudulent conveyances'; (i) "determinations as to the dischargeability of particular debts"; (j) "objections to discharges"; (k) "determinations of the validity, extent, or priority of liens"; (l) "confirmations of plans"; (m) "orders approving the use or lease of property"; (n) "orders approving the sale of property"; (o) "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship"; and (p) the "recognition of foreign proceedings and other matters under chapter 15 of title 11."

substantive state law" (internal quotation omitted)).  Nor is this the type of proceeding that would

"arise only in bankruptcy."  Insurance coverage disputes are heard by non-bankruptcy courts

every day.  This action, governed by state law,  "could be enforced in a state court proceeding

absent the bankruptcy." *In re Toledo*, 170 F.3d at 1350.   Under the Eleventh Circuit's test, that

makes this matter non-core.

Accordingly, because this proceeding clearly "does not invoke a substantive right created

by the federal bankruptcy law and is one that could exist outside of bankruptcy," it is a non-core

proceeding. *See, generally, In re Charter Co.*, 913 F.2d 1575, 1577 n. 2  (11th Cir. 1990) ("non-

core proceedings deal with non-bankruptcy, state law claims collateral to a bankruptcy.").

Instead, this "is the type of . . . case routinely tried in federal court and is somewhat removed

from the bankruptcy court's realm of expertise." *NDEP Corp. v. Handl-It, Inc. (In re NDEP*

*Corp.)*, 203 B.R. 905, 908 (D. Del. 1996).

Significantly, courts have repeatedly confirmed that insurance coverage actions such as

this one are "non-core." *See Mt. McKinley Ins. Co. v. Corning Inc.,* 399 F.3d 436, 450 (2d Cir.

2005); *In re U.S. Brass Corp.*, 110 F.3d 1261, 1268 (7th Cir. 1997); *see also In re*

*Cinematronics, Inc.*, 916 F.2d 1444, 1450 (9th Cir. 1990) ("state law contract claims …are not

core claims"); *Nat'l Century Financial Enterprises v. Gulf Ins. Co.*, 312 B.R. 344, 355 (Bankr.

S.D. Ohio 2004) (finding that a dispute over directors' and officers' insurance coverage was non-

core because it did not invoke a substantive right created by federal bankruptcy law and because

the matter could exist outside of the bankruptcy context); *In re G-1 Holdings, Inc.*, 278 B.R. 725,

735 (Bankr. D.N.J. 2002) (same); *Executive Risk Indemnity, Inc. v. Boston Regional Medical*

*Center, Inc.,* 285 B.R. 87, 90 (Bankr. D. Mass. 2002) (insurance coverage action complaint

deemed non-core because it "requires only an examination of the rights of [the insured] under

the policy. It does not arise under the Bankruptcy Code but under state contract and insurance law; it is not integral to the bankruptcy process or to the adjustment of the debtor-creditor relationship."); *In re Lawrence Group*, 285 B.R. 784, 788 (N.D.N.Y. 2002) (holding that an insurance coverage dispute "involves ordinary state-law claims on a first-party insurance contract and does not otherwise implicate the debtor's rights under the Bankruptcy Code"); *In re Glen Ivy Resorts, Inc.*, 171 B.R. 98, 100 n.7 (Bankr. C.D. Cal. 1994) ("the court agrees that declaratory relief actions to determine coverage are non-core matters"). This Court should reach the same result here, and conclude that this action is a "non-core" dispute.

The conclusion that this action is a non-core proceeding is particularly compelling here because of the nature of this insurance coverage dispute. As explained in the Moving Insurers' pending motions to dismiss, the TOUSA debtors have no basis to pursue their claims, which concern insurance coverage for the defense of Director Defendants in the Underlying Action. *See generally* Fed. Mot. to Dismiss [Doc. No. 86]; Mot. to Dismiss by Certain 2006-09 Insurers [Doc. No. 91]. Instead, this is a coverage action that may be brought, if at all, only by the Director Defendants. Because this action concerns insurance coverage for non-debtor insureds, it clearly is not a dispute that "would arise only in bankruptcy." *In re Toledo*, 170 F.3d at 1348; *see also Corning* 399 F.3d at 450 (insurance coverage action deemed "non-core" based in part on the fact that it involved "the rights of non-debtors only. . ."). Thus, there simply is no basis for treating this action as a core proceeding.

## III.   THE NON-CORE STATUS OF THIS CASE AND RELATED CONSIDERATIONS PROVIDE GOOD CAUSE FOR WITHDRAWING THE REFERENCE

In addition to the fact that this matter is a "non-core" proceeding, the other factors relevant to the analysis of whether to withdraw the reference – such as promoting the

"economical use of the parties' resources," the "efficient use of judicial resources," the "prevention of delay," the "advancement of uniformity in bankruptcy administration," and the facilitation of "the bankruptcy process" – also favor withdrawal. *Control Center*, 288 B.R. at 274 (citing *In re Simmons*, 200 F.2d 738, 742 (11th Cir. 2000)).

For example, withdrawing the reference would further the goals of judicial efficiency and economy and prevent unnecessary delay. Because this is a non-core proceeding, the Bankruptcy Court would not be able to enter a final judgment, but rather could only render proposed findings and conclusions, which the District Court would then have to review *de novo*. 28 U.S.C. § 157(c)(1). Thus, if the reference were not withdrawn, the parties and the Bankruptcy Court would be required to expend substantial amounts of time and resources arguing and considering questions of state insurance law (over which the Bankruptcy Court has no particular expertise). Such duplication obviously results in inefficient use of judicial resources, delays the bankruptcy proceedings significantly, and results in a delayed resolution. This, in turn, can result in an enormous waste of estate assets that could otherwise be preserved to compensate the creditor classes in general. *See, e.g., In re Orion*, 4 F.3d at 1101 ("unnecessary costs could be avoided by a single proceeding in the district court"); *Control Center*, 288 B.R. at 274.

Withdrawing the reference, on the other hand, would avoid such a grossly inefficient use of judicial and party resources. *See, Security Farms*, 124 F.3d at 1009 ("Inasmuch as a bankruptcy court's determinations on non-core matters are subject to *de novo* review by the district court, unnecessary costs could be avoided by a single proceeding in the district court."); *In re Addison*, 240 B.R. at 50 ("if withdrawal is denied, this Court may be forced to revisit this very motion in the form of the findings of fact and conclusions of law of the bankruptcy judge");

*see also In re Orion Pictures*, 4 F.3d at 1101 (same).  At bottom, there simply is no reason for the Bankruptcy Court to hear this matter on a non-binding basis, only to have the same issue later decided by the District Court.

In addition, for all of the reasons discussed above, adjudication of the insurance coverage issues presented by the TOUSA debtors' Complaint would have absolutely no impact on the "uniformity of bankruptcy administration" or the "bankruptcy process."  *Control Center,* 288 B.R. at 274.  Far from it, this matter arises under state insurance contract law, and does not in any way implicate concerns regarding the administration of the bankruptcy code.

For all of these reasons, there is no compelling justification for retaining this matter in the Bankruptcy Court, and all of the factors favor withdrawing the reference.

## IV.    THE REFERENCE MUST BE WITHDRAWN BECAUSE CERTAIN OF THE MOVING INSURERS HAVE PROPERLY DEMANDED A JURY TRIAL

In addition, the Court should also withdraw the reference to the Bankruptcy Court because certain of the Moving Insurers have properly demanded and are entitled to a jury trial. Indeed, for that reason alone, the removal of this action from the Bankruptcy Court would be warranted.

The Seventh Amendment to the Constitution provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved."  U.S. CONST. AMEND. VII.   The Supreme Court has ruled that "Suits at common law" referred to controversies in which legal rights were to be determined, distinguishable from those cases in which "equitable rights alone were recognized, and equitable remedies were administered."  *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989) (internal citations omitted).  Furthermore, "[i]f it is determined that the claim is legal in nature, then the case must be tried before a jury . . ."  *Torcise* v. *Comty. Bank of Homestead,* 131 B.R. 503, 505 (S.D. Fla.

1991).  Finally, a jury trial is required under the Seventh Amendment whenever the claim

"involves a matter of private right." *Granfinanciera*, 492 U.S. at 42 n. 4; *see also Torcise,* 131

B.R. at 505.

There simply is no doubt that this matter, which involves the determination of contractual

rights between private parties, is legal in nature.  *See, e.g., Northwestern Inst. of Psychiatry, Inc.*

*v. Travelers Indem. Co.*, 272 B.R. 104, 111 (E.D. Pa. 2001) (interpretation of insurance policy is

legal in nature); *Bernheim, et al.* v. *Chubb Ins. Co. of Canada,* 160 B.R. 42, 45 (Bankr. D.N.J.

1993) ("An action to recover on an insurance policy is a garden-variety contract action.").  *See*

*also Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 352 (1998) ("We have

recognized the general rule that monetary relief is legal.") (citations omitted).  Therefore, the

Moving Insurers are clearly entitled to a jury trial.  Consequently, certain of the Moving Insurers

have filed a timely demand for trial by jury contemporaneously with the instant motion.  *See* Fed

R. Civ. P. 38(b).

Significantly, courts have held that the existence of a jury trial right, as is the case here,

itself constitutes "cause" to withdraw the reference.  *See, e.g., In re 131 Liquidating Corp.*, 222

B.R. at 211.  In that regard, it is well established that the Seventh Amendment right to a jury trial

constitutes a right to jury trial in an Article III court.  *Granfinanciera*, 492 U.S. at 54-55.  In

order to preserve that right, § 157 provides:

> [i]f the right to a jury trial applies in a proceeding that may be heard under this
> section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if
> specially designated to exercise such jurisdiction by the district court *and with the*
> *express consent of all the parties.*

28 U.S.C. § 157(e) (emphasis added).  *See also,* Fed. R. Bankr. P. 9015(b) (emphasis added).

The Moving Insurers here do *not* consent to a jury trial in the Bankruptcy Court, as is

their right.  Accordingly, because the Moving Insurers do not consent to a jury trial in the

Bankruptcy Court, that Court may not conduct such a proceeding in this case. *See Control Center*, 288 B.R. at 279; 28 U.S.C. § 157(e). *See also Refrigerant Reclamation Corp. of Amer. v. Todack (In re Refrigerant Reclamation Corp. of Amer.)*, 186 B.R. 78, 85 (Bankr. M.D. Tenn. 1995) (under 28 U.S.C. § 157(e), "[a]bsent consent, that jury trial moves across the street to district court").

Furthermore, because the adversary proceeding must, by law, ultimately move to the District Court due to the Moving Insurers' jury trial right, the reference to the Bankruptcy Court should be withdrawn now, rather than later, to prevent duplication and wasted resources by the parties and the Courts. *See, e.g., Gumport v. Growth Fin. Corp. (In re Transcon Lines)*, 121 B.R. 837, 838-39 (C.D. Cal. 1990) (withdrawing reference because defendants had a right to jury trial and bankruptcy court did not have jurisdiction to conduct such proceedings). As the *Transcon* court succinctly stated,

> due to the fact that the district court judge must eventually preside over the jury trial in this matter, it would constitute a tremendous waste of judicial resources to permit the bankruptcy judge to continue to maintain jurisdiction over the issues presented in this litigation.

*In re Transcon Lines*, 121 B.R. at 838.

Similarly, in this case "the district court judge must eventually preside over the jury trial" in this insurance coverage action. Consequently, "it would constitute a tremendous waste of judicial resources to permit the bankruptcy judge to continue to maintain jurisdiction over the issues presented in this litigation." Therefore, the Court should withdraw the reference now.

## CONCLUSION

For the reasons set forth herein, the Moving Insurers respectfully moves this Court to withdraw the reference of this action from Bankruptcy Court.

Dated:  December 11, 2009

Respectfully submitted,

HOGAN & HARTSON LLP
Laura Besvinick
Jason Kellogg
Local Counsel For Federal Insurance
   Company
Barclays Financial Center
1111 Brickell Avenue, 19th Floor
Miami, FL 33131
Tel: 305.459.6500
Fax: 305. 459.6550

By: /s/ Laura Besvinick
        Laura Besvinick
        Florida Bar No. 391158

HOGAN & HARTSON LLP
Peter R. Bisio
Douglas Crosno
Lead Counsel For Federal Insurance
   Company
555 Thirteenth Street, NW
Washington, DC 20004
Tel: 202.637.5749
Fax: 202.637.5910

LYDECKER LEE BERGA &  DE
ZAYAS, LLC
Christopher G. Berga
Local counsel for Zurich American
   Insurance Company
1201 Brickell Ave. #500
Miami, Florida  33131
Tel:  305.416.3180
Fax:  305.416.3190
Email: cgb@lydeckerlaw.com

By: /s/ Christopher G. Berga
        Christopher G. Berga
        Florida Bar No. 141445

PAUL JOSEPH MCMAHON, P.A.
Local Counsel for XL Specialty Insurance
   Company
The Wiseheart Building
2840 S.W. Third Avenue
Miami, FL 33129
Tel.: 305.285.1222

By: /s/ Paul Joseph McMahon
        Paul Joseph McMahon
        Florida Bar No. 204552

BOUNDAS, SKARZYNSKI, WALSH &
   BLACK LLC
James Skarzynski
James Sandnes
Chelsea Walsh
Lead Counsel for XL Specialty Insurance
   Company
One Battery Park Plaza
New York, NY 10004
Tel.: 212.820.7744
Fax:  212.820.7740

MELAND RUSSIN & BUDWICK
Peter D. Russin
Richard Lubliner
Local Counsel for Westchester Fire
   Insurance Company
200 S. Biscayne Blvd. #3000
Miami, FL 33131
Tel:  305.358.6363
Fax:  305.358.1221

By:  /s/ Richard Lubliner
        Richard Lubliner
        Florida Bar No. 0047741

PEABODY & ARNOLD LLP
Harvey Weiner (*pro hac vice* pending)
Robert McCall (*pro hac vice* pending)
E. Joseph O'Neil (*pro hac vice* pending)
Lead Counsel for Zurich American
  Insurance Company
600 Atlantic Avenue
Federal Reserve Plaza
Boston, MA 02210
Tel: 617.951.2061

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
Brain M. McKell
Local counsel for St. Paul Mercury
Insurance Company (incorrectly named
herein as St. Paul Travelers Co., Inc.)
100 Southeast Second Street – Suite 3800
Miami, FL 33131
Tel: 305.374.4400
Fax: 305.579.0261

By: /s/ Brian M. McKell
        Brian M. McKell
        Florida Bar No. 97573

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
Lead Counsel for St. Paul Mercury
  Insurance Company (incorrectly named
  herein as St. Paul Travelers Co., Inc.)
R. Douglas Noah, Jr. (to be admitted *pro
hac vice*)
Thomas M. Spitaletto (to be admitted *pro
hac vice*)
Bank of America Plaza - 901 Main Street,
Suite 4800
Dallas, TX 75202-3758
Tel: 214.698.8000
Fax: 214.698.1101

HODGSON RUSS LLP
Patrick M. Tomovic (to be admitted *pro hac
vice*)
Brent J. Nowicki (to be admitted *pro hac vice*)
Lead Counsel for Westchester Fire
  Insurance Company
The Guaranty Building
140 Pearl Street
Buffalo, NY 10036
Tel: 716.848.1398

KAPLAN ZEENA LLP
Michael Foster
Local Counsel for RSUI Indemnity
  Company
2 S. Biscayne Blvd. #3050
Miami, FL 33131
Tel: 305.530.0800

By: /s/ Michael Foster
        Michael Foster
        Florida Bar No. 0042765

KAUFMAN BORGEEST & RYAN LLP
Joan Gilbride (*pro hac vice* pending)
Robert Benjamin (*pro hac vice* pending)
Lead Counsel for RSUI Indemnity
  Company
120 Broadway, 14th Floor
New York, NY 10271
Tel: 212.980.9600
Fax: 212.980.9291

SOLOWSKY & ALLEN, P.L.
Richard L. Allen, Esq.
Local Counsel for Allied World
  Assurance Company (U.S.) Inc.
Museum Tower, Suite 2000
150 West Flagler Street
Miami, FL 33130
Tel: 305.371.2223
Fax: 305.373.2073

By: /s/ Richard L. Allen
        Richard L. Allen
        Florida Bar No. 295485

CARLTON FIELDS
Stephen Brodie
Robert Gilbert
Gwynne Young
Sam J. Salario, Jr.
Counsel for National Union Fire
    Company of Pittsburgh, Pa.
4000 International Place
100 S.E. Second Street
Miami, Florida 33131-2114
Tel: 305.539.7302
Fax: 561-659-7368

By: /s/ Stephen Brodie
        Stephen Brodie
        Florida Bar No. 333069

MOUND COTTON WOLLAN &
GREENGRASS
Ira S. Bergman
Lead Counsel for Arch Insurance Company
        101 NE Third Avenue, Suite 1500
Ft. Lauderdale, FL 33301
Tel: 954. 467.5800
Fax: 954.467.5880

By: /s/ Ira S. Bergman
        Ira S. Bergman
        Florida Bar No. 980900

ARNSTEIN & LEHR LLP
Local counsel for AXIS Reinsurance
    Company
Stephen C. Hunt (Florida Bar No. 191582)
David Ray (Florida Bar No. 13871)
200 E. Las Olas Blvd., #1700
Fort Lauderdale, FL 33301
Tel: 954.713.7600

By: /s/ David Ray
        David Ray
        Florida Bar No. 13871

THOMPSON, LOSS & JUDGE LLP
Lewis Loss (*pro hac vice* pending)
Jeffrey J. Ward (*pro hac vice* pending)
Charles Chotvacs (*pro hac vice pending*)
Lead Counsel forAllied World
    Assurance Company (U.S.) Inc.
Two Lafayette Center
1133 21st Street, NW, Suite 450
Washington, DC 20036
Tel: 202.778.4060
Fax: 202.778.4099

SHOOK HARDY & BACON LLP
Lea Souza-Rasile
Local Counsel for Beazley Insurance
    Company, Inc.
Miami Center, Suite 2400
201 South Biscayne Boulevard
Miami, FL 33131-4332
Tel: 305.358.5171
Fax: 305.358.7470

By: /s/ Lea Sousa-Rasile
        Lea Sousa-Rasile
        Florida Bar No. 731269

SEDGWICK, DETERT, MORAN & ARNOLD
LLP
Joseph M. Smick
Jeffrey M. Winn
Lead Counsel for Beazley Insurance
    Company, Inc.
125 Broad Street, 39th Floor
New York, NY 10004-2400
Tel: 212.422.0202
Fax: 212.422.0925

DRINKER BIDDLE & REATH LLP
Douglas M. Mangel
Joseph A. Bailey III
Lead Counsel for AXIS Reinsurance
  Company
1500 K Street, NW
Washington, DC 20005-1209
Tel:  202.842.8837
Fax:  202.842.8465

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the forgoing was served on

December 11, 2009 *via* this Court's CM/ECF system on all those CM/ECF registered persons

who have appeared in this adversary proceeding.


By:   <u>s/ Paul Joseph McMahon</u>
Paul Joseph McMahon


4846-8298-5221, v.  5

# EXHIBIT 1

1

```
 1              UNITED STATES BANKRUPTCY COURT
                SOUTHERN DISTRICT OF FLORIDA
 2
        IN RE:                    CASE NO. 08-10928-BKC-JKO
 3
        TOUSA, INC.,  et al.,
 4
                 Debtors.
 5       _____/
        TOUSA, INC., et al.,
 6
                 Plaintiff,       CASE NO. 09-2281-BKC-JKO-A
 7       vs.
 8       FEDERAL INSURANCE
        COMPANY,
 9               Defendant.
         _____/
10
              EX PARTE MOTION TO EXTEND TIME TO RESPOND TO
11       ADVERSARY COMPLAINT FILED BY DEFENDANT XL SPECIALTY
                      INSURANCE COMPANY (8)
12
13                      December 1, 2009
14
15              The  above-entitled  cause  came  on  for
16       hearing  before  the  JOHN  K.  OLSON,  one  of  the
17       judges  of  the  UNITED STATES  BANKRUPTCY COURT,  in
18       and  for the  SOUTHERN  DISTRICT OF FLORIDA,  at  299
19       East  Broward  Boulevard,  Fort  Lauderdale, Broward
20       County,  Florida  on  December 1, 2009  commencing at
21       or  about  3:30 p.m., and  the following  proceedings
22       were had:
23
24
25              Reported By:  Bonnie Tannenbaum


        OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875
```

2

```
 1                        APPEARANCES:

 2                  BERGER SINGERMAN, P.A., by
         PAUL STEVEN SINGERMAN, ESQUIRE, (Via Telephone)
 3                         and
                   KIRKLAND & ELLIS, LLP, by
 4         DANIEL T. DONOVAN, ESQUIRE, (Via Telephone)
           MATHEW E. PAPEZ, ESQUIRE, (Via Telephone)
 5         NADER E. BOULOS, ESQUIRE, (Via Telephone)
                On behalf of the Debtor/Plaintiff
 6

 7                   CARLTON FIELDS, by
                   ROBERT N. GILBERT, ESQUIRE,
 8           GWYNNE YOUNG, ESQUIRE, (Via Telephone)
         SAM J. SALARIO, JR., ESQUIRE, (Via Telephone)
 9         On behalf of National Union Fire Insurance
                    Company of Pittsburgh, PA
10

11             PAUL JOSEPH MCMAHON, P.A., by
                   PAUL J. MCMAHON, ESQUIRE,
12                         and
         BOUNDAS, SKARZYNSKI, WALSH & BLACK, LLC,by
13          JAMES SANDNES, ESQUIRE, (Via Telephone)
           On behalf of XL Specialty Insurance Company
14

15                  KAPLAN ZEENA, LLP, by
                   MICHAEL C. FOSTER, ESQUIRE,
16                         and
                KAUFMAN, BORGEEST & RYAN, LLP, by
17       ROBERT A. BENJAMIN, ESQUIRE, (Via Telephone)
         JOAN M. GILBRIDE, ESQUIRE, (Via Telephone)
18           On behalf of RSUI Indemnity Company

19
               MOUND COTTON WOLLAN & GREENGRASS, by
20              IRA S. BERGMAN, ESQUIRE, and
                   JASON M. CHODOS, ESQUIRE
21           On behalf of Arch Insurance Company

22
               MELAND RUSSIN & BUDWICK, P.A., by
23              RICHARD S. LUBLINER, ESQUIRE
                         and
24               HODGSON RUSS, LLP, by
         PATRICK M. TOMOVIC, ESQUIRE, (Via Telephone)
25         BRENT J. NOWICKI, ESQUIRE, (Via Telephone)
           On behalf of Westchester Fire Insurance Company
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

3

```
 1          LYDECKER, LEE, BERGA & DEZAYAS, LLC, by
         CHRISTOPHER G. BERGA, ESQUIRE, (Via Telephone)
 2                          and
                  PEABODY & ARNOLD, LLP, by
 3          ROBERT A. MCCALL, ESQUIRE, (Via Telephone)
         On behalf of Zurich American Insurance Company
 4

 5          SEDGWICK, DETERT, MORAN & ARNOLD, LLP, by
          JOSEPH M. SMICK, ESQUIRE, (Via Telephone)
 6          JEFFREY M. WINN, ESQUIRE, (Via Telephone)
             On behalf of Beasley Insurance Company
 7

 8             SOLOWSKY & ALLEN, P.L., by
          RICHARD L. ALLEN, ESQUIRE, (Via Telephone)
 9                          and
                THOMPSON LOSS & JUDGE, LLP, by
10          LEWIS K. LOSS, ESQUIRE, (Via Telephone)
        On behalf of Allied World Insurance Company, Inc.
11

12            DRINKER BIDDLE & REATH, LLP, by
         JOSEPH A. BAILEY, III, ESQUIRE, (Via Telephone)
13                          and
                   ARNSTEIN & LEHR, LLP, by
14          STEPHEN C. HUNT, ESQUIRE, (Via Telephone)
            On behalf of AXIS Reinsurance Company
15

16            HOGAN & HARTSON, LLP, by
           JASON KELLOGG, ESQUIRE, (Via Telephone)
17                          and
         DOUGLAS S. CROSNO, ESQUIRE, (Via Telephone)
18          On behalf of Federal Insurance Company

19

20                     ALSO PRESENT:

21             WILLIAM HOWELL, Law Clerk

22

23

24

25
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1            THE COURT:  Good afternoon.  This is Judge

2    Olson.  Let me take appearances in the courtroom,

3    first.

4            MR. MCMAHON:  Good afternoon, Your Honor,

5    Paul McMahon on behalf of the movant, XL Specialty

6    Insurance Company, and I have on the phone lead

7    counsel, Jim Sandnes, S-A-N-D-N-E-S.  He's with

8    Boundas, Skarzynski, Walsh & Black.  He's been

9    admitted pro hac vice, and he will be arguing the

10   motion on behalf of XL.

11           THE COURT:  Thank you, Mr. McMahon.

12           MR. GILBERT:  Good afternoon, Judge.

13           THE COURT:  Good afternoon, Mr. Gilbert.

14           MR. GILBERT:  Bob Gilbert on behalf of

15   National Union Fire Insurance Company of Pittsburgh,

16   PA, and I believe Gwynne Young may be on the call as

17   co-counsel, and we joined in XL's motion, Judge.

18           THE COURT:  Thank you.

19           MR. LUBLINER:  Good afternoon, Your Honor,

20   Richard Lubliner of Meland Russin & Budwick.  We

21   represent Westchester Fire Insurance Company, and I

22   believe on the phone is Garry Graber, who is lead

23   counsel on the case, of Hodgson and Russ, and we,

24   too, joined in XL's motion to enlarge time.

25           THE COURT:  Thank you.

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

5

```
1              MR. BERGA:  Good afternoon, Your Honor,
2   Chris Berga of Lydecker, Lee on behalf of Zurich
3   American Insurance Company.  On the phone with me is
4   lead counsel, Robert McCall of Peabody & Arnold.
5   Mr. McCall has filed a motion to be admitted pro hac
6   vice, but that motion has yet to be granted.  It was
7   filed today.
8              THE COURT:  Okay.  Very good.
9              MR. BERGMAN:  Good afternoon, Your Honor,
10  Ira Bergman with the law firm of Mound, Cotton,
11  Wallan & Greengrass here on behalf of Arch Insurance
12  Company.  We filed our notice of appearance yesterday
13  afternoon, and joined in XL's motion, as well.
14             THE COURT:  Thank you.
15             MR. CHODOS:  Good afternoon, Your Honor,
16  Jason Chodos, also with Mound, Cotton, Wollan &
17  Greengrass, also on behalf of Arch Insurance.
18             THE COURT:  Thank you, Mr. Chodos.
19             MR. FOSTER:  Good afternoon, Your Honor,
20  Michael Foster on behalf of RSUI Indemnity Company.
21  We, Your Honor, are local counsel for the company,
22  and with me on the phone is Robert Benjamin, and, I
23  believe, Joan Gilbride of the law firm of Kaufman,
24  Borgeest and Ryan, LLP.
25             THE COURT:  Very good.  Let me take
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   appearances on the phone, please.

2          MR. SANDNES:  Your Honor, this is Jim

3   Sandnes.  Paul McMahon mentioned that I was on the

4   phone.

5          THE COURT:  Yes, indeed.

6          MR. SANDNES:  I'm lead counsel for XL.

7          THE COURT:  Very good.

8          MR. KELLOGG:  Good afternoon, Your Honor,

9   Jason Kellogg from Hogan and Hartson's Miami's

10  office.  I'm here with Doug Crosno from our D.C.

11  office.  We represent Federal Insurance.  Doug will

12  be filing a motion to appear pro hac, and we'd like

13  to join XL's motion to extend.

14         THE COURT:  Very good.  And you represent

15  which insurance company?  I'm sorry.

16         MR. KELLOGG:  Federal Insurance Company.

17         THE COURT:  Federal.  Thank you.

18         MR. ALLEN:  Good afternoon, Judge.  This is

19  Richard Allen from Solowsky & Allen in Miami.  We're

20  local counsel for Allied World Insurance.  And also

21  on the phone is Lou Loss from Thompson Loss & Judge

22  in Washington, D.C. as lead counsel for Allied, and

23  they will also be filing a motion pro hac vice.

24         THE COURT:  Very good.

25         MR. TOMOVIC:  Good afternoon, Your Honor,

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

```
 1   Patrick Tomovic from Hodgson Russ.  We are lead
 2   counsel for Westchester Fire Insurance Company, and
 3   we join in XL's motion, as well.
 4            THE COURT:  Thank you.
 5            MR. NOWICKI:  Good afternoon, Your Honor,
 6   Brent Nowicki, also from Hodgson Russ, on behalf of
 7   Westchester --
 8            THE COURT:  I'm sorry, counsel, I have no
 9   idea what your name is.
10            MR. NOWICKI:  Brent Nowicki.
11            THE COURT:  Thank you.  How do you spell
12   Nowicki, sir?
13            MR. NOWICKI:  N-O-W-I-C-K-I.
14            THE COURT:  Thank you.
15            MS. YOUNG:  Your Honor, this is Gwynne
16   Young confirming that I am, indeed, on the phone
17   along with my partner, Sam Salario, counsel for
18   National Union.
19            THE COURT:  Very good, Ms. Young and
20   Mr. Salario.
21            MR. SMICK:  Your Honor, my name is Joe
22   Smick, S-M-I-C-K, and I'm with my partner, Jeff Winn,
23   W-I-N-N.  We've just been retained as lead counsel
24   for Beazley Insurance Company, and we're in the
25   process of trying to find local counsel in Florida so
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

```
 1    as to file our pro hac motions.
 2              THE COURT:  Well, I'm sure you'll find
 3    somebody to sign on, and --
 4              MR. SMICK:  We sure are trying, but our
 5    intent is to join in the motion.
 6              THE COURT:  Okay.  Very good.  Is there
 7    anybody representing the debtors on the line?
 8              MR. DONOVAN:  Yes, Judge, Dan Donovan from
 9    Kirkland & Ellis for the debtors.  With me is Mat
10    Papez, Nader Boulos, both from Kirkland, and I
11    believe Mr. Singerman is also on the line, Judge.
12              MR. SINGERMAN:  Good afternoon, Your Honor,
13    it's Paul Singerman from Berger Singerman, and I am
14    on the line.
15              THE COURT:  Very good.
16              MR. BENJAMIN:  And, Your Honor, Robert
17    Benjamin for RSUI.
18              THE COURT:  RSUY?
19              MR. BENJAMIN:  RSUI.
20              THE COURT:  UI, thank you.  Okay.
21              MR. BAILEY:  Joe Bailey on the line on
22    behalf of AXIS Reinsurance, which has also joined in
23    XL's motion.  My pro hac vice motion is pending, your
24    Honor.
25              THE COURT:  Okay.  I've never denied one of
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

9

1    those, so you all can rest somewhat easy.

2              MR. HUNT:  And, Judge, Stephen Hunt as

3    local counsel for AXIS.

4              THE COURT:  Thank you, Mr. Hunt.  And, Mr.

5    Hunt, I think it's your line that sounds like someone

6    is taking a shower in the background, so if you

7    could, take it off the speaker.

8              MR. HUNT:  I'll mute it, Judge.

9              THE COURT:  Thank you.  Well, now, whose --

10   Mr. Sandnes, I think it's your lead motion.

11             MR. SANDNES:  Yes, it is, Your Honor.  And

12   first of all, thank you for admitting me pro hac

13   vice.  I guess we got our motions in a little earlier

14   than some of the other people.

15             As you can tell from this call, there are

16   many, many parties in this case.  There are -- this

17   case involves two towers of directors' and officers'

18   insurance in two different years.

19             In general, the way these towers work is

20   that the excess layers follow form.  That is, they

21   provide the same type of insurance as the primary,

22   and XL is the primary in one of the years.  And

23   because the excess layers all have many of the same,

24   if not identical, legal and factual issues involved,

25   it's traditional to try to coordinate the efforts of

```
 1    the various insurers, so, frankly, Your Honor is not
 2    burdened with 8 or 10 or 15 different motions from
 3    different law firms asserting many of the same
 4    things.
 5           So although my firm has been retained for
 6    some period of time, and Mr. Skarzynski of my firm,
 7    who is a well known insurance lawyer, was involved in
 8    some discussions with the debtor, I, myself, as a
 9    litigator, have only been involved for a few weeks.
10    And one of the things I did is, after we accepted
11    service on -- voluntarily accepted service on the
12    10th of the month, is I contacted debtors' counsel
13    and requested an extension of time to give us -- to
14    give -- for the entire tower, which rests on the XL
15    primary policy, and I didn't, frankly, anticipate
16    that we would be here on a motion, because in 23
17    years of practicing law, I've never not been able to
18    negotiate a reasonable extension of time to answer a
19    complaint.
20           The debtors have granted us only a two-day
21    extension of time.  Under the local rules, the 25
22    days from issuance of the summons on the 6th runs
23    today.  The debtors have agreed to extend until
24    Thursday, the 3rd of December, but because many of
25    the excess layers are only now retaining counsel,
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   and some of them still do not have counsel in place,

2   it's very hard to coordinate on the filing, and

3   especially -- that's especially true because, of

4   course, as Your Honor knows, the Thanksgiving holiday

5   occurred last week.

6         And so we are making a very simple,

7   straightforward motion and, frankly, I'm sorry we

8   all have to spend this time to bother you on this,

9   but we're making a very straightforward motion just

10   asking for an extra, essentially, two weeks, and a

11   little bit more, until the 18th of December within

12   which to respond to the adversary complaint.  But,

13   however, it has been opposed.

14         I don't believe there's been any showing of

15   any exigency here.  The only exigency that's been

16   raised is that the underlying case against the

17   directors and officers, you know, is going forward,

18   and that they have to answer on the 11th of January.

19   However, there's a pending motion to stay that case.

20         We're prepared to go forward expeditiously

21   in this coverage action, but, really, I think, as you

22   can see from the number of lawyers involved, it's

23   going to take us a little time to get everybody's

24   ducks in a row, and figure out who is representing

25   whom, and to get some coordinated filings to you,

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    which I think are, you know, in the best interest of

2    judicial economy.

3            So with that, unless you have any

4    questions, I'll stop and let the debtors respond.

5            THE COURT:  No.  I think I understand your

6    position.  Mr. Donovan, what's the deal here?

7            MR. DONOVAN:  Sure.  And, Judge, I'll

8    start -- these are unusual circumstances.  The issue

9    here, we've been meeting with the insurers for a long

10   time.  As you know, there's the fiduciary duty

11   lawsuit that is proceeding that we have a pending

12   motion to stay.  If that's not granted, basically,

13   the insurance that one of these parties has

14   coverage -- they're disputing which of the two towers

15   has coverage.  But individuals -- the very reason the

16   company took out this insurance is to have defense

17   costs covered in this situation.  Well, neither

18   insurance is willing to pay.  These individuals have

19   to hire lawyers.  That case is going to have to go

20   forward, unless it's stayed.

21           So they're put in this position where we

22   paid millions of dollars for insurance, and when it

23   matters, they want to litigate and delay.  And,

24   really, the two lead primaries have known about this

25   for years.

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1        So we understand.  Usually, we would always

2    agree to extensions, but these are unusual

3    circumstances, with January the 11th quickly coming

4    up.

5        THE COURT:  What is on January the 11th?

6    I'm sorry.

7        MR. DONOVAN:  That's the date the

8    individuals in the fiduciary duty lawsuit, who would

9    have coverage under one of these two towers, have to

10   answer in the fiduciary duty lawsuit.  So, in other

11   words, we need to attempt to get coverage, which we

12   believe we have.  The question is, which of the two

13   towers has to provide the coverage before that.  They

14   intend to answer.  We believe it's a very straight-

15   forward issue, Judge, that can be briefed to Your

16   Honor, but the longer they delay, these individuals,

17   who we paid millions of dollars to have this

18   insurance when you need it, now want to delay, and no

19   one wants to provide that insurance.  That's the

20   issue for the company, and those individuals that now

21   have to go out of pocket to try to get representation

22   themselves.

23       And they've known about this, Judge.  Not

24   only have we met with them over the years, we've been

25   giving them updates.  And I know there's many people

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

14

```
 1    in these towers, but the lead primary insurers have
 2    known about this for a long time, and they've laid
 3    out their defenses to us, and they're laid out in our
 4    complaint.
 5              THE COURT:  Okay.
 6              MR. SANDNES:  Your Honor, if I could just
 7    respond to just one or two points there.
 8              THE COURT:  Mr. Sandnes, is that you?
 9              MR. SANDNES:  Yes, it is, Your Honor.
10              THE COURT:  Thank you.
11              MR. SANDNES:  First of all, the January
12    11th date is obviously a date that is set by the
13    Court, by the rules, and is extendable in the
14    fiduciary duty litigation, which is before Your
15    Honor.  But more fundamentally, I don't believe that
16    anyone thinks this case is going to be fully resolved
17    and litigated by January 11th.
18              And to the extent that -- whether we
19    answer, or we move to withdraw the reference, we move
20    to dismiss, or somebody moves for summary judgment,
21    given the Christmas holidays coming up, and the New
22    Year holiday, the suggestion that somehow we need to
23    have to answer by Thursday of this week so that
24    there's a chance this case will be fully done by
25    January 11th seems to me, frankly, a little bit
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    absurd.

2          This case is not going to be done by

3    January 11th.  The only way it's -- so whether we

4    answer this week, or next week, or the week after is

5    not going to get this case decided before or after

6    January 11th any faster.

7          As to the point about us having met with

8    them, yeah, Mr. Skarzynski of this firm did meet with

9    them once in an attempt to work out the issues, but,

10   you know, that meeting was only attended by the

11   primary carriers, and none of the excess carriers,

12   who are the people with whom we are trying to

13   coordinate on the filings, were present or had

14   counsel retained, as far as I know.  I'll let them

15   speak for themselves.  But as far as I know, none of

16   them even had counsel retained, much less looking at

17   this from a litigation point of view.

18         And, frankly, Mr. Skarzynski is not a

19   litigator, he's an insurance lawyer, and he was there

20   trying to work out a deal.  We weren't girded for war

21   and preparing motions.  Apparently Kirkland was,

22   because they filed two days after the meeting.  So,

23   you know, they apparently had a team already working

24   on a litigation strategy at the same time that they

25   were trying to have discussions with us.  We were

```
 1   not, as a matter of fact.  As far as I know, the

 2   excess carriers were not even invited to that

 3   meeting, so they couldn't have participated or have

 4   any of the knowledge necessary for this.

 5           And, you know, the last point I would make

 6   is that this is not a motion for advancement. I mean,

 7   there is a procedure by which, if there is a need

 8   for a preliminary ruling for advancement, that the

 9   debtor or an appropriate party, because, frankly, I

10   think the motion needs to be made by the people

11   seeking the coverage, which would be the D's and O's,

12   but there is an avenue available for a preliminary

13   ruling.  It's used in a number of insurance cases,

14   but the answer or response to the complaint is not

15   that avenue.

16           And so that's not the issue -- the

17   advancement is not the issue that's even before you,

18   and it's not what we're responding to.  The complaint

19   is broader than that, and the response to the

20   complaint would be broader than that.

21           THE COURT:  Forgive me, Mr. Sandnes, I am

22   not an insurance lawyer.  What is the procedure for

23   advancement?

24           MR. SANDNES:  Your Honor, typically, in

25   these cases, a motion for a preliminary injunction is
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

```
 1   made when necessary to get a preliminary ruling under
 2   a likelihood of success type standard, and there's a
 3   body of case law on this, but normally when there's
 4   an issue, a coverage issue going on, and the insurers
 5   dispute coverage, and the insureds request
 6   advancement of defense costs, normally it's judged
 7   under a Rule 65 standard for a preliminary
 8   injunction.
 9           THE COURT:  Oh, okay.  Huh.  Mr. Donovan,
10   do you anticipate filing such a Rule 65 motion?
11           MR. DONOVAN:  Well, what I was going to
12   suggest, Judge, I do have my partner on, who is an
13   insurance litigator, Nader Boulos, who will be
14   litigating the insurance issues, but, I guess, two
15   points:  One is, if that's the suggestion to route,
16   that may be a way to go.  And maybe we can set a
17   schedule for that now, because our biggest concern,
18   both from the company, and who the company purchased
19   this insurance for, is this fiduciary duty
20   litigation, which currently is proceeding.
21           And if they're willing to go that route,
22   maybe that's something we can consider.  But I
23   believe that's going to have to be on an expedited
24   track, as well, because of, really, the big issues
25   that are coming up in that case.
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

```
1              THE COURT:  Okay.  Mr. Boulos, do you want
2    to tell me something?
3              MR. BOULOS:  Your Honor, I think
4    Mr. Donovan captured it exactly correctly.  And I
5    would just add that we really need the answers to see
6    if we can -- what kinds of motions we can make,
7    unless we're able to work out a schedule now to
8    proceed in an expedited fashion, as it sounds like
9    Mr. Sandnes is willing to do.
10             THE COURT:  Okay.  Well, we will proceed in
11   an expedited fashion.  Are the insurance companies
12   intending to file answers or some different kind of
13   responsive pleading?  Mr. Gilbert.
14             MR. GILBERT:  Judge, Bob Gilbert on behalf
15   of National Union.  We are an excess carrier, Judge,
16   in both towers.  And, candidly, we did not
17   participate in any of these pre-litigation settlement
18   negotiations.  So, the service of the lawsuit on
19   us -- we're seeing these issues laid out in full in
20   the complaint for the first time.
21             Candidly, there are some serious issues
22   here concerning standing of the debtor to bring this
23   suit, jurisdiction of this Court to enter final
24   orders in this suit, possible withdrawals of
25   reference, not to mention the coverage issues, which
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

```
 1   are, in and of themselves, complex.

 2           THE COURT:  Well, the coverage issues are

 3   what this case is all about, I would have assumed.

 4           MR. GILBERT:  They are, Judge.

 5           THE COURT:  Okay.

 6           MR. GILBERT:  But there are issues also as

 7   to where these issues get decided.  So it's not as

 8   straightforward, perhaps, as plaintiffs' counsel

 9   would point out.  And I'd also point out, Judge, that

10   if you look at the timing on this, the D&O case

11   was filed on June 9th.  XL sent a letter on July 7th

12   on its primary coverage saying that there did not

13   appear to be any coverage available.  On July 28th,

14   Federal sent a letter denying coverage on the primary

15   policy.  It's been over three months -- it was over

16   three months before the plaintiffs filed this

17   lawsuit, and all of a sudden we have some exigency

18   here that this has to be resolved somehow by a date

19   in another case before Your Honor in January.

20           I would simply say, Judge, if there's an

21   exigency, it's really of the plaintiffs' making, and

22   not the defendants', especially the excess coverage

23   defendants.  We've asked for a modest two plus weeks

24   to respond to some very complex litigation.  It's a

25   perfectly reasonable request, Judge, and we think
```

1   that, you know, good cause has been shown for that.

2          We would ask Your Honor to give us at least

3   that time to file whatever response is appropriate.

4   It could be a motion to dismiss, it could be an

5   answer.  We're not sure at this point, candidly,

6   Judge.

7          THE COURT:  Okay.  Anyone else want to

8   respond to that?

9          MR. ALLEN:  Judge, Richard Allen on behalf

10  of Allied World.  What Mr. Donovan didn't say is that

11  the plaintiff, the debtors, had meetings, or

12  conversations or communications with my client, one

13  of the excess insurers.  And like previous counsel,

14  you know, the first indication we received of this is

15  the filing of a complaint.  I was only retained last

16  week, Wednesday, right before the Thanksgiving

17  holiday.  The complaint has exhibits numbering in the

18  hundreds of pages.  These are complex issues, and I

19  also believe that we have shown -- we've joined in

20  the motion, that the defendants have shown why good

21  cause exists for a two week enlargement of time, and

22  we respectfully request that the Court grant the

23  motion.

24          THE COURT:  Thank you.  Anyone else wish to

25  be heard?

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

```
 1              MR. DONOVAN:  Judge, Dan Donovan.  Just
 2    briefly, to respond, I won't repeat, it's in our
 3    papers, the chronology.  We spent a lot of time over
 4    the summer and fall, trying to get this resolved with
 5    both -- what I'll call both towers.  So any kind of
 6    statement that we delayed was really our attempt to
 7    get this resolved, short of litigation, to not have
 8    to spend the money.
 9              And to now hear, after paying millions of
10    dollars to have this insurance in place, that they
11    won't even answer your question what they're going to
12    file -- after years, they don't know what they're
13    going to file?  This is what we're going to keep
14    hearing, and that's what we're concerned about.
15              THE COURT:  Okay.  Then I will extend the
16    answer date to December 11th, which gives you all ten
17    days from today.  And I'll have a status conference
18    in this adversary proceeding on December 29th,
19    Tuesday, at 1:30.  We can discuss at that point what
20    people can rationally anticipate for a timetable,
21    and if a motion needs to be filed in the D&O
22    adversary, because in some fashion, that adversary
23    shouldn't go forward until issues in this case are
24    resolved, then I would consider that, as well, on
25    December 29th, so long as the motions are filed by
```

1   the 18th.

2          Now, what have I just said that causes

3   heartburn amongst any in the crowd?

4          MR. MCMAHON:  Your Honor, Paul McMahon on

5   behalf of XL.  If I may, my understanding is -- not

6   involved in the adversary, but my understanding is

7   that in the underlying D&O case, there is already

8   pending a motion to stay that case, and I believe it

9   is set for hearing before this Court on Friday,

10  December 4 at -- I think it's at 1:30, I'm not

11  sure --

12          THE COURT:  Okay.

13          MR. MCMAHON:  -- of the time, so I think

14  that's already before the Court.  So I would suggest

15  that on Friday, whatever -- if the Court considers

16  that motion favorably, whatever exigent circumstances

17  there are have just evaporated, and we've all rushed

18  for, frankly, no good reason.

19          MR. DONOVAN:  Judge, Dan Donovan for the

20  debtors.  We do have that motion set for this Friday

21  to stay this litigation -- stay the -- excuse me

22  there's too many litigations, to stay the fiduciary

23  duty litigation pending the resolution of this

24  insurance litigation, and that is fully briefed, and

25  that will be argued.  There may be some more papers,

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

```
 1   I don't know, from the committee coming in on that,

 2   you know, and obviously we submit that that should be

 3   done to do this in an orderly fashion.

 4           I do have concerns on behalf of the estate

 5   that that should not be taken by the insurers, even

 6   if you're going to grant the motion, we submit you

 7   should, for reason for them to delay.  I do think

 8   that this needs to get resolved quickly, even if you

 9   do stay the fiduciary duty litigation.

10           So that's set for this Friday, and that is,

11   I believe, at 9:30 in your courtroom.

12           THE COURT:  Right.  I note a Tousa hearing

13   there.  I don't have a list on the calendar I have

14   before me of all that's on the calendar.

15   Mr. Gilbert.

16           MR. GILBERT:  Just as a point of

17   clarification, Judge, you had set December 11th, and

18   I think Your Honor said an answer date, but --

19           THE COURT:  I mean a responsive pleading.

20           MR. GILBERT:  A response date?

21           THE COURT:  A response date.

22           MR. GILBERT:  Thank you, Judge.

23           THE COURT:  Does anyone else have any

24   comments?

25           MR. BERGA:  Your Honor, Chris Berga on
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   behalf of Zurich.

2          THE COURT:  Mr. Berg.

3          MR. BERGA:  Berga, Your Honor.

4          THE COURT:  Yes, sir.

5          MR. BERGA:  We previously filed, last week,

6   on the eve of Thanksgiving, a motion for extension of

7   time, as well.  We have not jointed in on XL's

8   motion, we have a separate standing motion, which I

9   believe was set today by the Court for hearing on

10  December 16th.  I would just like to confirm that we

11  can proceed with our motion on December 16th, Judge.

12  We've just been retained as counsel.  I know that

13  lead counsel has also just been retained on the eve

14  of Thanksgiving, and I know I echo the statements

15  made earlier by other excess carriers on the need to

16  coordinate with the tower participants in order to

17  coordinate an appropriate response to the complaint.

18         So I would just ask if, number one, we'll

19  be bound by that December 11th deadline.  If not, we

20  would like to continue with our pending motion set on

21  December 16th.

22         THE COURT:  And your motion is a standing

23  motion?

24         MR. BERGA:  Judge, it's a motion for

25  extension of time to respond to the complaint.

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

```
1              THE COURT:  Well, you can have until
2     December 11th to answer the complaint.  We can cancel
3     the hearing on the 16th and save everybody some
4     aggravation.
5              MR. BERGA:  Okay, Judge.
6              THE COURT:  Mr. McMahon.
7              MR. MCMAHON:  Your Honor, I was just going
8     to ask the Court if, perhaps, we could get the
9     extension that we have requested, which is just,
10    basically, a two week extension, if this Court grants
11    the motion to stay the underlying D&O action.
12             In other words, the order emanating from
13    this hearing would be contingent, your responses are
14    due December 11th, unless this Court grants the stay
15    in the other adversary proceeding, in which case the
16    insurers shall have, as requested, until December
17    18th.
18             THE COURT:  What's the deal about a week,
19    Mr. McMahon?  Why can't you get your act together in
20    10 days and you -- when was the lawsuit served?
21             MR. MCMAHON:  I think it was served in
22    early November, Your Honor.
23             THE COURT:  And so six weeks isn't enough
24    to figure out what you're going to do?
25             MR. MCMAHON:  Well, as you can see, Your
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   Honor, there are a number of parties that are still

2   looking for counsel in the matter, and I believe that

3   it will serve the interest of this Court if

4   everything is coordinated.

5         THE COURT:  Well, I will concede that, but

6   the only comment I heard in respect of counsel was

7   that one of the groups needs local counsel.  I think

8   that's AXIS -- no, that's not.

9         MR. SMICK:  That would be myself, Your

10  Honor, Joe Smick for Beazley Insurance Company.

11        THE COURT:  Yes, sir.

12        MR. SMICK:  And just to add, although,

13  being we're a high excess insurer, and, frankly, we

14  knew little about what had been going on until we

15  received, by regular post, a copy of the complaint

16  that had been filed.  We didn't receive that until

17  about two weeks ago.

18        So it's not like, you know, this has been

19  in everyone's hands for a very long time.

20        MR. FOSTER:  Your Honor, Mike Foster.  I

21  think that's generally true of all the excess

22  carriers.  Just so that the Court is clear, we had

23  not heard of this until the last few weeks.  We have

24  not been participants in the ongoing negotiations

25  that apparently the primaries have had.

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

```
 1            And, indeed, Your Honor, we had tried to do
 2       a little legwork, and perhaps Mr. Benjamin can speak
 3       more directly to this, and find out what the status
 4       of the negotiations were, if litigation was
 5       imminent, and we had not been provided that
 6       information, despite our requests.
 7            So, again, I don't want the Court to labor
 8       under the misapprehension we've been sitting on our
 9       rights.
10            THE COURT:  Thank you.
11            MR. LUBLINER:  Similarly, Your Honor --
12       Richard Lubliner representing Westchester Fire
13       Insurance.  We were actually just retained yesterday
14       as co-counsel, so we have not been given ample time
15       to get up to speed.  We just received the adversary
16       complaint last evening.
17            So, again, it's not like we were sitting on
18       the complaint, either.
19            THE COURT:  Thank you.
20            MR. BENJAMIN:  Your Honor, this is Robert
21       Benjamin for RSUI.  The comment a moment ago is in
22       reference to e-mails that I personally had with
23       Tousa's representative after the complaint had been
24       filed requesting information that my client, RSUI,
25       had asked for for over a month, and had been told
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

28

```
 1   that a response to our request would be forthcoming
 2   in the following week.
 3           So there was an opportunity for them to
 4   tell us that, in fact, a complaint had been filed
 5   against our client, and they neglected to do that.
 6   We had been given a false belief that we would
 7   receive some amorphous response in the following
 8   week.
 9           THE COURT:  Thank you.
10           MR. BERGMAN:  Your Honor, not to belabor
11   the point, Ira Bergman for Arch.  Arch is an excess
12   carrier.  You've heard from some of the other counsel
13   for the excess.  We, too, were not involved in
14   negotiations with Tousa.
15           THE COURT:  The company's name is Tousa.
16           MR. BERGMAN:  Sorry, Tousa.  We were not
17   involved in the negotiations with the primary
18   carriers.  In fact, Arch was served, not to put too
19   fine a point on it, but Arch was served on the 13th
20   of November, and they retained -- they talked to me
21   about representing them Thanksgiving week.  In fact,
22   our conflict check was not even finalized until
23   yesterday.
24           So, again, I join the comments that we
25   were not sitting on our hands.
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

```
 1              THE COURT:  Okay.  Anyone else want to be
 2    heard?  Well, with the fiduciary duty litigation
 3    delays being sought on the 4th, which is Friday of
 4    this week, my inclination is to leave the responsive
 5    pleading date as the 11th.  I'm not sure what I'm
 6    going to do with the -- I don't know what I'm going
 7    to do with the fiduciary duty action request for a
 8    stay.  I gather that's -- Mr. Donovan, is that your
 9    motion?
10              MR. DONOVAN:  It is the debtors' motion,
11    Your Honor.
12              THE COURT:  And what is the
13    plaintiff/committee's position?
14              MR. DONOVAN:  They oppose it.
15              THE COURT:  Okay.  That issue, you say, has
16    been briefed?
17              MR. DONOVAN:  Yeah, that has been joined,
18    Judge, and I know Mr. Golden isn't on the phone,
19    but we've had discussions, but I know it's his view
20    that he is concerned about delay in his case, and,
21    you know, we're concerned about the delay in the
22    insurers' case, and we're concerned about the
23    company, and the individuals we purchased this
24    insurance for, being the ones that are put out, when,
25    you know, we purchased directors' and officers'
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

```
 1   insurance.  Our directors and officers are now
 2   getting sued.  I'm not an insurance litigator, but it
 3   doesn't seem very complicated to me, and I know we're
 4   litigated out.
 5           But that's the concern that we have, and
 6   why we moved to stay the fiduciary duty litigation
 7   until this insurance dispute can be resolved, and
 8   that's set for hearing Friday morning.
 9           THE COURT:  Right.  Do you know what else
10   is on the calendar on Friday morning, Mr. Donovan?  I
11   haven't looked at the detail calendar.
12           MR. DONOVAN:  I believe that might be it,
13   Your Honor, because we moved it one day at
14   Mr. Golden's request.
15           THE COURT:  That's right.
16           MR. DONOVAN:  There may be other issues,
17   but I believe that may be pretty much the only issue.
18           THE COURT:  Okay.  I'm satisfied that while
19   it may be inconvenient, and you people may have to
20   hustle, that the December 11th date is fair, and I
21   will, accordingly, ask you, Mr. Donovan, to give me
22   an order granting an extension to each of the
23   defendants in this adversary until December 11th to
24   respond, and setting a hearing on a status conference
25   in this adversary at 1:30 on December 29th, and we
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

31

1   can, at that point, if there are motions pending that

2   I need to consider, I may consider them at that time.

3   I don't know what you all are going to file, but

4   we're going to proceed quickly in this case.  I don't

5   anticipate that this litigation, however much --

6   however many parties there are, and however

7   complicated some of you may think the issues are, I

8   don't think this is nearly as complicated as the

9   fiduciary duty lawsuit, for example, or the

10   committee's lawsuit -- fraudulent transfer lawsuit.

11           But we're going to proceed expeditiously.

12   Mr. McMahon.

13           MR. MCMAHON:  Yes, Your Honor.  I would

14   just like to ask if perhaps Mr. Donovan could provide

15   us with a draft of his proposed order before he

16   submits it to Your Honor.

17           THE COURT:  Sure.  Do you have the whole

18   cast of characters, Mr. Donovan?

19           MR. DONOVAN:  We'll get them, Your Honor.

20   We've served everyone, so we'll have it.  And I'd ask

21   on the insurance side, since I know they coordinate,

22   if I send it to one and leave someone off the list,

23   please include the others.

24           THE COURT:  I expect that they will be

25   cooperative in that regard.

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

32

```
 1              Is there anything else we need to do this
 2      afternoon?  Then thank you very much, and I look
 3      forward to seeing you right after Christmas.  Thank
 4      you.
 5              (Thereupon, the hearing was concluded.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

```
 1                    CERTIFICATION

 2

 3   State of Florida:

 4   County of Dade:

 5

 6         I,  BONNIE  TANNENBAUM,  Shorthand Reporter

 7   and Notary  Public  in  and  for the State of Florida

 8   at Large,  do  hereby  certify  that  the  foregoing

 9   proceedings  were  taken  before  me at  the date and

10   place  as  stated  in  the caption  hereto on Page 1;

11   that the  foregoing computer-aided transcription is a

12   true record of  my  stenographic  notes taken at said

13   proceedings.

14         WITNESS  my  hand this 4th day of December,

15   2009.

16

17         _____
                BONNIE TANNENBAUM
18         Court Reporter and Notary Public
          in and for the State of Florida at Large
19          Commission Number:  DD 567145
               Expires:  June 22, 2010
20

21

22

23

24

25


     OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875
```

# EXHIBIT 2

```
 1            UNITED STATES BANKRUPTCY COURT
              SOUTHERN DISTRICT OF FLORIDA
 2               Judge John K. Olson

 3

 4                        Case No.:  08-10928-BKC-JKO
                          Jointly Administered
 5

 6   In Re:

 7   TOUSA, INC., et al.,

 8       Debtor.
     _____/
 9

10

11

12

13          ALL MOTIONS ON THE CALENDAR

14               December 4, 2009

15          (3323), (3337), (22), (30), (33)

16

17         The above-entitled cause came on for hearing

18   before the HONORABLE JOHN K. OLSON, one of the Judges

19   of the UNITED STATES BANKRUPTCY COURT, in and for the

20   SOUTHERN DISTRICT OF FLORIDA, at 299 East Broward

21   Boulevard, Fort Lauderdale, Broward County, Florida,

22   on Friday, December 4, 2009, commencing at or about

23   9:30 a.m., and the following proceedings were had:

24

25                        REPORTED BY:  Helayne Wills
```

OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

```
 1   APPEARANCES:

 2
         KIRKLAND & ELLIS, by
 3       JOSHUA SUSSBERG, ESQ., (via telephone)
         BRIAN SCHARTZ, ESQ., (via telephone)
 4       DANIEL DONOVAN, ESQ.
         BETH WILLIAMS, ESQ.
 5       on behalf of the Debtors

 6
         AKIN GUMP STRAUSS HAUER & FELD, by
 7       PHIL DUBLIN, ESQ.
         STEPHEN BALDINI, ESQ.,
 8       and
         STEARNS WEAVER, by
 9       PATRICIA A. REDMOND, ESQ. (via telephone)
         DAVID POLLACK, ESQ.
10       and
         ROBBINS RUSSELL ENGLERT ORSECK UNTEREINER &
11       SAUBER, by
         MICHAEL WALDMAN, ESQ., (via telephone)
12       on behalf of the Committee of Unsecured
         Creditors
13

14       CHADBOURNE & PARKE, by
         SEVEN RIVERA, ESQ. (via telephone)
15       and
         STICHTER RIEDEL BLAIN & PROSSER, by
16       RICHARD PROSSER, ESQ. (via telephone)
         on behalf of Citicorp
17

18       BRACEWELL & GIULIANI, by
         ILIA O'HEARN, ESQ. (via telephone)
19       on behalf of the Second Lien Holders and Wells
         Fargo, as successor administrative agent
20

21       GAMBERG & ABRAMS, by
         THOMAS ABRAMS, ESQ.,
22       on behalf of various homeowners' associations

23

24

25

            OUELLETTE & MAULDIN COURT REPORTERS   (305)358-8875
```

```
 1            THE COURT:  Let me take appearances in
 2   TOUSA, please.
 3            MR. DONOVAN:  Good morning, Your Honor.
 4   Dan Donovan, Kirkland & Ellis, for the debtors.
 5   With me is my colleague, Beth Williams.
 6            MS. WILLIAMS:  Good morning, Your Honor.
 7            THE COURT:  Good morning.
 8            MR. DUBLIN:  Good morning, Your Honor.
 9   Phil Dublin and Stephen Baldini from Akin Gump, and
10   David Pollack from Stearns Weaver, on behalf of the
11   creditors' committee.
12            THE COURT:  Good morning.
13            MR. ABRAMS:  Your Honor, Tom Abrams.  I
14   represent several condominium associations.  I think
15   our matters have been adjourned.  We're going to be
16   submitting an agreed order on the 16th.
17            THE COURT:  Anyone else wish to make an
18   appearance?
19            MR. RIVERA:  Good morning, Your Honor.
20   Seven Rivera, Chadbourne & Parke, on behalf of
21   Citibank as agent.
22            THE COURT:  Very good.
23            MR. SUSSBERG:  Good morning, Your Honor.
24   Joshua Sussberg and Brian Schartz, from Kirkland &
25   Ellis, on behalf of the debtors.
```

```
 1              THE COURT:  Good morning.
 2              MS. O'HEARN:  Good morning, Your Honor.
 3    Ilia O'Hearn from Bracewell & Giuliani on behalf of
 4    the second lien agent.
 5              THE COURT:  Good morning.
 6              MS. REDMOND:  Good morning, Your Honor.
 7    Patricia Redmond, co-counsel for the Official
 8    Committee of Unsecured Creditors.
 9              THE COURT:  Good morning.
10              MR. PROSSER:  Good morning, Your Honor.
11    Richard Prosser on behalf of the first lien term
12    loan.
13              THE COURT:  Good morning, Mr. Prosser.
14              MR. WALDMAN:  Good morning, Your Honor.
15    Michael Waldman for the official committee.
16              THE COURT:  Good morning, Mr. Waldman.
17              We have a couple of uncontested matters.
18    Who's running the show here?  Mr. Sussberg, are you
19    orchestrating from abroad?
20              MR. SUSSBERG:  Yes, Your Honor.  I
21    appreciate you allowing us to dial in.
22              We had originally planned on a fuller
23    agenda this morning, but we have agreed in
24    connection with ongoing discussions with the
25    creditors' committee and counsel for the revolver
```

OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

5

1    and first lien term loan agents to adjourn the cash

2    collateral final hearing on the fifth interim cash

3    collateral order, which Your Honor entered last

4    month, to December 16th, but we would like Your

5    Honor, if you are so willing, to order the record

6    this morning, and allow us the use of cash

7    collateral through December 16th.  Technically, our

8    use of cash collateral expired yesterday.

9              THE COURT:  Does anyone object or wish to

10   be heard in connection with the extension of the use

11   of cash collateral through the hearing on

12   December 16th?

13             Mr. Rivera?

14             MR. RIVERA:  We do not.  We agree with

15   Mr. Sussberg's presentation.

16             THE COURT:  Okay.  Anyone else?

17             Then it is ordered that the authorization

18   to use cash collateral contained in what is now --

19   the fifth, Mr. Sussberg?

20             MR. SUSSBERG:  Yes, Your Honor, the fifth

21   interim.

22             THE COURT:  -- the fifth interim order

23   authorizing the use of cash collateral is extended

24   through the hearing on cash collateral scheduled for

25   December 16, 2009.  If that hearing should for any

          OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

1    reason be continued, the use of cash collateral will

2    be extended through the date of the continued

3    hearing.

4           MR. SUSSBERG:  Thank you, Your Honor.  I

5    am hopeful that we'll be able to work to a

6    consensual resolution with the committee and the

7    agents, and present that on the 16th, which would

8    allow us the use of cash collateral, I believe

9    through the end of April.  So we will be able to put

10   cash collateral to the side for a short duration.

11          THE COURT:  Well, there are other things

12   to talk about.

13          MR. SUSSBERG:  Just to be quick, before we

14   get into the adversary proceeding matter, I'm going

15   to turn it over to Mr. Schartz, who can address the

16   motion to approve the Campana agreement.

17          I know Your Honor previously entered the

18   order approving CIT Group's motion for late claim in

19   connection with our agreement with CIT, with respect

20   to that claim, so we can cover those two issues

21   quickly.

22          THE COURT:  Mr. Schartz.

23          MR. SCHARTZ:  Good morning, Your Honor.

24   Brian Schartz from Kirkland & Ellis on behalf of the

25   debtors.

```
 1          The first item on the agenda was CIT's

 2   motion to file late proof of claim.  The order has

 3   already been entered, but I want to highlight for

 4   the Court, the temporary resolution of the motion is

 5   that there will be held at a hearing on a date to be

 6   determined, and that both the debtors and the

 7   committee reserve their rights to object to the

 8   motion on any grounds whatsoever, except in the

 9   argument that the parties have been prejudiced by

10   any delay caused by the adjournment.

11          With that, I think we can just move on to

12   the second item.

13          THE COURT:  Very good.

14          MR. SCHARTZ:  This is the debtors' motion

15   approving TOUSA Homes, Inc. entrance of purchase and

16   sale agreement with Gino Campana, dated

17   November 19th, and that is docket entry 3337.  This

18   is a motion for approval of an asset sale of 60 lots

19   located in a Colorado development known as Sidehill,

20   for a purchase price of $540,000.

21          Normally, because the purchase price is

22   less than a million dollars, this asset sale will be

23   done pursuant to the expedited process set forth in

24   the order, status and procedures, which the Court

25   entered early in the case in March 2008.
```

```
 1            THE COURT:  Remember, Mr. Schartz, that
 2    the court reporter is struggling to take down your
 3    breathless prose, so if you would slow down just a
 4    little.
 5            MR. SCHARTZ:  Absolutely.  I'm just eager
 6    to get to the rest of the show.
 7            THE COURT:  I understand.
 8            MR. SCHARTZ:  In this instance, Your
 9    Honor, the borrowing base value of the property,
10    which is determined by a formula that was set forth
11    in the third cash collateral order, is greater than
12    the proposed sale price, and under the non-core
13    asset sale procedures, the debtors are required to
14    file a separate motion for approval of the sale.
15            The proposed sale is a culmination of an
16    effort to sell the lots that began in April 2009,
17    after the debtors announced their revised business
18    plans shift away from new home sales and
19    construction starts.  The debtor initially
20    contracted 42 potential buyers, but the marketing
21    efforts resulted in only two offers, including the
22    current offer by Campana, and in fact, the second
23    offer was subsequently retracted.  The Court made a
24    decision to proceed with negotiating a purchase
25    price with Campana.
```

OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

```
1              In light of the debtors' marketing

2      efforts, the debtors believe that the $540,000

3      purchase price represents the best and highest offer

4      for the property, and is therefore sound exercise of

5      the debtors' business judgment.

6              Similarly, the debtors' function

7      assignment of contracts under the proposed purchase

8      agreement does not exercise the debtors' business

9      judgment, because TOUSA Homes, with selling its

10     interest in the property, and obtaining performing

11     under the contracts, or conversely rejecting the

12     contracts, does not make business sense.

13             Additionally, the debtors believe there

14     are no short costs associated with these functions,

15     and assignment of contracts and the purchase

16     agreements, and the debtor has reason to believe

17     that Campana has the financial wherewithal to

18     perform the contracts as required under Section

19     365(f) of the Bankruptcy Code.

20             Lastly, Your Honor, the debtor submits

21     that the purchase agreement and terms of the sale to

22     Campana is a product of good faith, arms-length

23     negotiation between TOUSA Homes and Campana, and

24     Campana is therefore entitled to the benefits of

25     Section 363(m) of the Bankruptcy Code.  The
```

1    objection deadline for this motion was

2    November 29th, and no objections have been filed.

3           Unless there are any questions from the

4    Court or anyone in the courtroom, I request the

5    Court enter an order authorizing TOUSA Homes to

6    enter into the purchase agreement with Gino Campana

7    and perform all of its obligation thereunder.

8           THE COURT:  Does anyone wish to be heard

9    in connection with the motion to approve the Campana

10   sale?

11          Hearing none, I will grant the motion.

12          MR. SCHARTZ:  We'll submit an order after

13   the hearing.

14          THE COURT:  Than you, Mr. Schartz.

15          Mr. Abrams is here representing some condo

16   associations.

17          MR. ABRAMS:  Homeowners' associations.  I

18   did say condo.

19          MR. SUSSBERG:  Your Honor, this is Joshua

20   Sussberg again.  We had spoken with Mr. Abrams, and

21   that matter is adjourned.  It was listed in the

22   notice of adjourned items.

23          We are working with Mr. Abrams, and we

24   intend to present an agreed order on the 16th.  So I

25   don't believe there's anything that we need to

         OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

 1   address today on that matter.

 2          THE COURT:  Thank you.

 3          I think that takes us up to adversary

 4   proceeding 09-1616, and the debtors' motion to stay

 5   the proceedings pending one of two possible results,

 6   the committee's opposition, and the debtors' reply.

 7          Mr. Donovan.

 8          MR. DONOVAN:  Good morning, Your Honor.

 9   We are here on the debtors' motion to stay the

10   fiduciary duty litigation on two separate and

11   independent grounds.

12          At the outset, it's important to note the

13   parties agree it is in the Court's discretion

14   whether or not to grant the stay.  So the issue is

15   whether or not the Court should exercise its

16   discretion.  As we said in the papers, and I hope to

17   present this morning, we believe it's reasonable,

18   judicious and sensible for you to do so.

19          In my presentation this morning, in

20   addition to answering any of your questions, I'd

21   like to address three issues.  One would be hitting

22   the high points of the three relevant actions before

23   you -- I'll get to those in a moment -- and how

24   they're interrelated, and how they impact the motion

25   to stay.  That's one.

          OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

1        Two, obviously, is why we believe you

2    should great the stay on one or both of the grounds

3    we submit.  Third is to address the committee's

4    arguments in its papers.  Let me start at the first.

5        May I approach, Your Honor?

6        THE COURT:  Yes, sir.

7        MR. DONOVAN:  The hand-up I gave you is

8    really just a summary listing I may refer to.  In

9    this bankruptcy proceeding, we've had at least three

10   relevant adversary proceedings.  First is the

11   fraudulent conveyance litigation between the

12   unsecured creditors and the secured creditors.

13       Your Honor knows more about that case than

14   anyone in the courtroom.  Your Honor ruled in that,

15   and in the Court's words provided relief that

16   intended to unwind the disputed July 31, 2007

17   transactions.  That ruling is now pending appeal.

18   That's number one, what I'll refer to as the

19   fraudulent conveyance litigation.

20       Second is the fiduciary duty litigation,

21   and that's between the unsecured creditors'

22   committee against certain directors and officers of

23   various TOUSA entities.  The complaint alleges one

24   count of breach of fiduciary duty against the

25   directors, and responses to that complaint is

OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

1   currently due January 11th.

2          THE COURT:  Does that action allege that

3   there are or were breaches of fiduciary duty, which

4   occurred prior to -- let me pick a date out of

5   midair -- December 15, 2006?

6          MR. DONOVAN:  I'd have to defer to the

7   committee on that, Your Honor.  I believe from their

8   complaint, there is a whole series of different

9   points that they allege are breaches or potential

10  breaches, that obviously is impacted in any

11  insurance litigation, but there's a whole series,

12  and I think that's going to be the dispute in the

13  information litigation, is where exactly is the

14  claim.

15         With respect to the fiduciary duty

16  lawsuit, a few important points I'd like to

17  highlight.  First, on May 28, 2009, the committee

18  moved for standing to assert those claims.  In other

19  words, they needed your permission to assert those

20  claims.

21         In its motion the committee told the Court

22  that it believes the $100 million in D & O insurance

23  was available to satisfy the fiduciary duty claims

24  they were asserting.  Significantly, that's the only

25  asset they specifically identify in their motion.

          OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

```
 1            The committee also recognized in its
 2   motion that it had a duty to satisfy the Court that
 3   the prosecution of those claims represented a
 4   sensible expenditure of the estate's funds, and it
 5   argued in that motion that the benefits of
 6   prosecuting those claims, the fiduciary duty claims,
 7   outweighed the costs, because obviously, there's
 8   going to be a lot of costs in litigating that.  They
 9   said that's because there's a hundred million
10   dollars in D & O insurance that was likely available
11   as a source of recovery.
12            On June 9th the committee filed their
13   complaint, and on June 11th, in an ex parte motion
14   from the committee, the Court granted the
15   committee's motion to suspend all deadlines until 30
16   days from the end of the fraudulent conveyance
17   litigation.  I'm going to come back to that, but I
18   think that's important, and if I could, I'd like to
19   hand up that order.
20            THE COURT:  Okay.
21            MR. DONOVAN:  Just for the record, this is
22   the order granting ex parte motion to suspend
23   adversary case deadlines, entered on June 11, 2009,
24   docket entry Number 10.
25            Your Honor, I'm going to come back to this
```

OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

1 when I deal with the committee's objections, but the

2 committee itself moved ex parte to suspend the

3 deadlines, and in that they didn't set a deadline.

4 If you look at Paragraph 3 of their proposed order,

5 they wanted all dates suspended until 30 days

6 after -- and it ended up being the conclusion of the

7 trial or your order in the fraudulent conveyance.

8   We'll come back to this, but this will

9 address their argument that our request it stay here

10 is somehow improper, because it's keyed off other

11 litigation.  We don't think that's right.  So that's

12 number two on my hand-up, the fiduciary duty

13 litigation.

14   Number three, the most recent of the

15 adversary proceedings, is the debtors' complaint

16 against the D & O insurance carriers.  We talked

17 about this earlier this week at the status

18 conference.  This complaint was brought by the

19 debtors after we couldn't reach agreement with the

20 two sets, or what's referred to as the towers of

21 insurers.  The debtors seek coverage for the cost of

22 the fiduciary duty litigation.

23   THE COURT:  It is curious that we have a

24 situation of twin towers here.

25   MR. DONOVAN:  Yes, it is.  Absolutely.

OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

1   We'll get to that.

2          There was insurance throughout the whole

3   relevant period.  It's not an issue of a gap.  The

4   debtors paid millions to have D & O insurance.  The

5   Ds and Os have now been sued.  We believe there's

6   coverage.

7          What's important about all these three

8   actions on my hand-up is, they're all before Your

9   Honor, and that's really going to differentiate some

10  of the cases that the committee cites.  I think

11  against that backdrop, I'd like to highlight why I

12  believe it is judicious, reasonable and sensible to

13  stay this fiduciary duty litigation on one of two

14  grounds.

15         The first is the insurance litigation.

16  The Court should stay the fiduciary duty litigation

17  until this Court resolves the insurance litigation,

18  and I would use the same wording the committee used,

19  which is 30 days from the conclusion of trial or

20  entry of an order.  We think it will be entry of an

21  order, because we believe it is an issue that can be

22  ruled on the papers.

23         The two biggest reasons, we expect it will

24  be quick.  Insurance litigation often is in

25  coverages relatively expeditious.  There will be

OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

```
 1   battles, I'm sure, but we don't think it will be

 2   anything like the fraudulent conveyance litigation.

 3   We have policies.  It's a question of who, and

 4   they're pointing at each other.

 5            Importantly, the action is before Your

 6   Honor, so you control the docket to some extent.

 7   Obviously, the parties will attempt to work together

 8   on a schedule.  It's important the case is before

 9   Your Honor.  As you know, the debtors are attempting

10   to move that, and I think some statements were made

11   against me earlier this week, that I'm trying to

12   move it too quickly.

13            Second, Judge, the stay pending the

14   insurance litigation is, all the parties in interest

15   need to know if the insurance exists.  Is it

16   absolutely required, no, but I think it makes good

17   judicial and reasonable sense to know that.  The

18   insurance policy is the only asset the committee

19   identified in its motion to keep standing.

20            Importantly, Judge, and this is equity and

21   control of your own docket, and what you believe is

22   right, because we believe it's fair for these

23   defendants, and there's more than 20 defendants, to

24   know whether they're going to be able to have legal

25   representation paid for.
```

OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

1        They're going to be responding to a very

2   good law firm of Akin Gump, making very serious

3   allegations.  This is about different individuals.

4   Some of them do have money.  Some of them don't have

5   money.  Some of them have been laid off from this

6   very company.

7        I'm very concerned that those people won't

8   be able to pay for representation.  You're going to

9   end up with a mess.  I'll get to that in a minute.

10       This is our notice of supplemental

11   authority we filed late yesterday.  We believe this

12   case is on all fours, with a situation a Judge in

13   the Southern District of Georgia faced.  This is the

14   Markel decision.  In that case, Judge -- it's a 2008

15   decision -- the question was whether the insurer

16   needed to provide to pay for the cost of defense for

17   the defendants in the underlying tort action.

18       Do you have that, Judge?  I can hand up a

19   copy.  I apologize.  I filed that late yesterday.

20       THE COURT:  No.  I saw your reply in

21   further support, but I think that was filed the day

22   before.  I didn't see yesterday's.

23       MR. DONOVAN:  This is a case in the

24   Southern District of Georgia from 2008 called Markel

25   versus O'Quinn, 566 F. Supp. 2d 1374.

OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

```
 1              In this case, Judge, the underlying tort
 2    action had some rather sad facts about a child that
 3    was killed at a trailer park.  That was the
 4    underlying tort action.  There was a dispute.  The
 5    defendants in the underlying tort action allegedly
 6    had insurance coverage, or they said they did.  The
 7    issue then in the case before, in Markel, was
 8    whether the insurer needed to provide a defense.
 9              Same as here.  The question is, does the
10    insurer need to provide a defense.
11              In that case the insurers rather than the
12    insured brought a declaratory judgment action to
13    determine whether they had to provide a defense,
14    same as here.  We asked you to resolve that.
15              In that action the insurer asked the Court
16    to stay the underlying tort action pending
17    resolution of the declaratory judgment action.  The
18    Court there -- it's a brief opinion, but it's
19    amazing.  It's very similar to the arguments made by
20    the committee.
21              The Court there concluded that the
22    scenario presented there, same as here, represents a
23    classic case for staying the underlying litigation
24    to resolve an insurance coverage issue in a
25    declaratory judgment action.  Obviously, this isn't
```

1    binding, Judge, but we do believe it's persuasive

2    when another Judge poses facts that we believe are

3    on all fours.

4          So what does the committee say in

5    response?  Well, the committee argues that the

6    debtor shouldn't seek an indefinite stay, and we

7    don't.  In fact, we seek the same stay the committee

8    sought in document Number 10 on the docket, which is

9    a stay pending the resolution of the insurance

10   litigation.  As we said, we believe that will be

11   expeditious.  If it's not, we're all before Your

12   Honor.  You can revisit the issue.

13         This situation, because they're all before

14   you, and this is an insurance case, whether there's

15   coverage for the related case before you

16   distinguishes it from Ortega and the other cases.

17         Ortega was about two different cases, not

18   an insurance -- not a declaratory judgment action,

19   whether the insurer needed to provide defense costs.

20   It was about two different cases in two different

21   courts, one here in the Southern District and the

22   other in the Bahamas.

23         The Court acted sua sponte.  It wasn't

24   where we both briefed you and you were fully

25   informed.  You control the speed on that.  So we

1   don't believe those cases are applicable.

2            The committee argues that some

3   defendants -- our argument that some defendants may

4   be judgment proof, it won't be a good use of the

5   estate's money to move ahead before we know about

6   insurance, they say that's no reason to stay the

7   case.  We disagree.

8            This is your discretion.  It doesn't make

9   sense to pursue a litigation against approximately

10  20 defendants, when more than half are probably

11  judgment proof without insurance.  I just want to

12  give you one example.

13            One of the defendants in the D & O

14  insurance cases, a director of one of the

15  subsidiaries, his name is Dave Shornburn (phonetic).

16  He was a TOUSA employee, as was his wife.  His wife

17  was laid off from TOUSA.  Mr. Shornburn no longer is

18  an employee of TOUSA.  He still consults with the

19  company when needed.

20            He's about 30 years old.  He has no assets

21  likely to provide even to pay for a lawyer, much

22  less for the committee, a law firm like Akin Gump

23  and Stearns Weaver, to litigate him pro se.  We

24  don't think it makes sense, Judge.

25            Finally, Your Honor, the committee argues

OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

1   that the debtors' delay, you know from the insurance

2   litigation -- one of the reasons they gave notice

3   early in the year to us, the debtors, that they

4   intend to file this lawsuit, was for us to try to

5   work with the insurers, and we did.  We provided

6   that correspondence to the committee as we got it

7   and since.  We've been trying, and we're going to

8   keep trying to get that resolved.

9           Your Honor, I just want to deal briefly

10  with the separate independent ground of staying this

11  case pending appeal.  This goes more to what's best

12  for the estate, rather than what's best for those

13  two cases.

14          The committee successfully litigated its

15  fraudulent conveyance claims.  Accordingly, the

16  Court provided relief, but intends to unwind those

17  transactions completely.  If the Court's order is

18  upheld on appeal, then the potential damages are

19  substantially diminished, because I don't think the

20  committee is saying they can double recover.

21          In going back to, the facts of the

22  committee's standing comes from your court's

23  permission, this is where we believe the Court can

24  exercise its authority to determine where the

25  estate's resources should be spent.  I didn't see in

OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

1   the papers any explanation from the committee about

2   whether it would be a double recovery or not.  Maybe

3   they'll explain that this morning.

4        Finally, Judge, in what is important in a

5   case like this, and I've read the committee's brief

6   several times, they don't allege any prejudice to

7   the committee or to any of the creditors.  There's

8   going to be this appeal, and I go back to the

9   insurance litigation -- they preach stay of the

10  fiduciary duty to resolve the insurance litigation.

11       They don't allege any prejudice, none.

12  Many courts said it's their burden to show

13  prejudice.  They showed none.  They don't even

14  allege any in their papers.

15       To the contrary, to the estate, as you

16  know from the litigation before you, if that goes

17  forward, the estate is going to have to deal with a

18  lot of discovery from a lot of defendants who

19  weren't in the other case, who weren't deposed.

20  We're going to have to make documents available.

21  It's going to be expensive.

22       Many of the defendants won't be able to

23  have paid legal representation.  I think they're

24  going to have representation.  It's a question of

25  whether they need to go out of pocket, and some

OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

1    people just can't.

2         Your Honor, for those reasons, a stay in

3    this court, we believe it's in your discretion.  We

4    believe it's reasonable, judicial and sensible.  I'm

5    happy to answer any questions.

6         THE COURT:  I'd like to focus you, because

7    frankly, I'm not terribly excited by the prospect of

8    staying the fiduciary duty action pending a

9    determination of the appeal on the fraudulent

10   transfer action, simply because that timetable is

11   somewhat more considerable, I suspect.  So I'd like

12   to focus on the insurance coverage litigation.

13        I have not focused on the allegations of

14   the fiduciary duty litigations as perhaps I should

15   have before today, but on the basis of what I know

16   from the fraudulent transfer action, I find it

17   difficult to believe that fiduciary duty claims have

18   not been stated, at least as to actions which

19   occurred in connection with the fraudulent transfer

20   transaction, the July 31, 2007 transaction.

21        It is therefore somewhat mystifying to me

22   as to the basis that the insurance companies assert

23   in good faith that there is no coverage for the

24   period, at least the first six or seven or eight

25   months of 2007.

OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

1         Do you have an understanding of what the

2    insurance companies' defenses are, and perhaps

3    purely technical from the language of the policy,

4    and/or what do you anticipate doing in the coverage

5    litigation to advance the question, and how quickly

6    can I expect that to be done?

7         MR. DONOVAN:  I'll answer in the order you

8    asked, Judge.

9         THE COURT:  Answer in any order you'd

10   like.

11        MR. DONOVAN:  First is the defenses, and

12   I'll tell you what I understand them to be from our

13   discussions over time.

14        The insurer at the time of July 2007 was

15   what I'll call the XL Tower.  Their argument is

16   that -- because we're providing notice that we had

17   beforehand, their argument is, this relates all the

18   way back to, in effect, the purchase of

19   Transeastern, and various steps in between.

20        To be sure, we gave notice to -- we've

21   been giving notice to everyone, as you could expect,

22   to our insurers, whenever we would receive anything.

23   The argument by XL is, "Well, the other insurer had

24   notice."

25        They're not saying there's no insurance.

1    They're saying, "Look to Chubb," the earlier tower.

2            This is a claims-made policy.  Although we

3    had notice, they say, "We don't have to cover it."

4            So it really is this (indicating), Judge,

5    pointing at each other.  I'm sure we'll see that

6    more on December 11th, what their actual responses

7    are, but that's our understanding.

8            Number two, your question what we intend

9    to do, we intend to do one of several things.  We

10   were hoping to get their answers to

11   determine, because usually -- and again, I'm not the

12   insurance litigator, but I've been told it's best to

13   see their answer, and then determine from that,

14   because sometimes insurers will say, "We believe we

15   have some coverage."

16           It depends on their answer.  So we've been

17   waiting for that.

18           In light of our call this week, we're

19   going to move for judgment or we're going to move

20   for advancement of costs.  There's a few other

21   avenue's we're looking at.  We'd like to see their

22   answer to basically do it most efficiently, but we

23   intend to do it this month, Judge.  We're not going

24   to wait.

25           THE COURT:  It does seem to me -- and this

     OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

1   is without the benefit of the insurance companies'

2   defenses -- but I find it difficult to believe that

3   the XL Tower can in good faith argue that they were

4   not independent acts, separate and apart from the

5   entry into the Transeastern transaction in the

6   summer of 2005, that give rise to claims.

7          How good those claims are is a separate

8   question, but if I were the insurance companies, I'd

9   be very concerned that refusing to provide coverage,

10  and denying the availability of coverage, could give

11  rise to bad faith claims, which it seems to me

12  exposes the insurers to substantially greater

13  liability than the mere hundred million dollars of

14  coverage that's available under the policies.  If

15  the insurers went to take that risk, that seems to

16  me to be a dangerous course to go down.

17         Similarly, the argument that, "Well, the

18  transaction goes back to Transeastern, that was a

19  dumb deal," it may have been a dumb deal.  It

20  certainly turned out to be that in retrospect, but

21  when it turned into a disaster, there were several

22  ways of dealing with that disaster.

23         I do understand the committee's view that

24  the transaction that the company ultimately entered

25  into was one that was worse, certainly for the

1   conveyance subsidiaries than other alternatives that

2   presented themselves.

3         I'm not, obviously, making any rulings,

4   but just thinking about this for a little bit, if

5   the insurance companies want to play games they can

6   do that, but I expect you to advance this litigation

7   promptly.

8         MR. DONOVAN:  We believe we can get relief

9   that would make the most sense to proceed with

10  fiduciary duty litigation, short of completing that

11  entire litigation.  So we don't think necessarily,

12  even requesting the stay, that it necessarily needs

13  to be the ultimate end.

14        We also hope as we proceed that the

15  insurers might see the light that we haven't been

16  able to show them to date, to provide coverage.  As

17  we move ahead quickly, we may be able to mediate

18  something, hopefully to get some resolution, maybe

19  even Court ordered mediation.

20        In a situation where there was insurance

21  the entire time, it's not a question of if, it's a

22  question of who.

23        THE COURT:  And perhaps both.

24        MR. DONOVAN:  That's absolutely true, Your

25  Honor.  That's why I don't think the list of

       OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

1    potential horribles are going to come to pass.  One,

2    it's before you, two, we believe it's going to be an

3    expeditious process, and then they can proceed with

4    the case.

5          THE COURT:  If I were to grant a stay, as

6    you request, are you, among other things, requesting

7    that the answer date in the fiduciary duty

8    litigation be extended indefinitely, or pending

9    further order?

10         MR. DONOVAN:  Yes, Your Honor.

11         THE COURT:  Give me a time frame within

12   which you would anticipate that you would have, if

13   not dispositive, at least progressive motions ready

14   to be heard in the coverage litigation.

15         MR. DONOVAN:  I believe they'll be filed.

16   I don't know when they'll be ready to be heard.  We

17   will be filing either later this month, or certainly

18   early after the new year.  We have our conference on

19   the 29th.  We would hope to do it before that, but

20   we need to see what they do on the 11th.

21         You figure from that, the briefing, maybe

22   that takes a month, February a ruling, so we're

23   thinking by the middle of the year that's resolved.

24   The committee is proceeding with its fiduciary duty

25   litigation.  I believe it's one of the carriers that

OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

1   suggested -- they hadn't done this when we met, but

2   suggested doing the advancement of fees the way it's

3   normally done is, you wait to see the answer first,

4   but we're going to proceed down that path, if that's

5   one they suggest.

6          THE COURT:  If it's on the basis of

7   advancement of fees, I don't see that there's any

8   particular reason why I should hold up the fiduciary

9   duty lawsuit, so long as the Ds and Os are provided

10  with defense.

11         MR. DONOVAN:  It's also in the insurers'

12  interest.  If they do that, then we have no reason

13  to have to keep every deadline as we currently do.

14  It's our duty to the estate to keep those.

15         I would normally provide that professional

16  courtesy, but we're kind of put in a box.  I think

17  if they advance fees, it takes the pressure off of

18  them, as well.  We'd be willing to have a different

19  schedule.  I think the committee wouldn't object to

20  a different schedule.

21         THE COURT:  Thank you very much.

22         Mr. Baldini.

23         MR. BALDINI:  Thank you, Your Honor.

24         Your Honor, your last comments have

25  substantially scuttled my outline, so I'm going

1   to --

2            THE COURT:  You can try teeing it up

3   anyway you'd like.

4            MR. BALDINI:  I'll try to address what I

5   believe is your major concerns, based upon your last

6   comments.

7            Obviously, we believe that the request for

8   a stay is insupportable in fact or law.  As a matter

9   of fact, there is no definitive timeline given here.

10  While I agree it is somewhat within the Court's

11  control, you had a lot of parties coming to you this

12  week and telling you that these were very complex

13  cases, very complex issues, and they needed time to

14  gather.

15           Under those issues, it's impossible to

16  predict that this case will move along quickly.

17           THE COURT:  By "this case," you mean the

18  coverage litigation?

19           MR. BALDINI:  Yes.

20           THE COURT:  Are you an insurance coverage

21  kind of lawyer?

22           MR. BALDINI:  I am not.  I'm a general

23  litigator.

24           THE COURT:  Okay.  Whoever is on the phone

25  who has your phone not on mute, please put it on

         OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

```
 1    mute, or I'll have to cut you off.  Thank you.
 2              MR. BALDINI:  Your Honor, these type of
 3    speculative and conditional statements as to why a
 4    stay is justified have routinely been rejected by
 5    courts.  It's the debtors' burden to prove the stay
 6    is justified.  We cited to you numerous cases in
 7    which stays were rejected under similar
 8    circumstances.
 9              I think it's worth noting, the debtors
10    have not distinguished any of these cases, and have
11    largely ignored them.  The case they cited for you,
12    it was a case where an insurer was actually
13    advancing costs, and then determined that coverage
14    was not available, and faced the Hobson's choice of
15    continuing to pay and come out of pocket when
16    coverage was not available, is complete opposite to
17    this case.
18              I just want to briefly discuss timeline of
19    what's happened in the past 11 months or so, so we
20    can put this into context about what has happened
21    here and what time frames we currently are facing.
22              The committee first sent a demand letter
23    over ten months ago to the debtors.  Over nine
24    months ago the committee filed a motion for leave to
25    bring the D & O litigation -- I'm sorry -- the
```

OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

1   fiduciary duty litigation.

2          At that time the debtors, the insurers and

3   the defendants all had notice of these claims, and

4   knew they were coming.  The complaint itself was

5   filed over six months ago.

6          Now, when the committee originally filed

7   the complaint, these same issues that are before you

8   today were before the debtors.  The debtors knew

9   they were facing coverage disputes.  They also knew

10  there was a parallel proceeding, which I understand

11  you're troubled by staying for that, so I'll move

12  that to the side.

13         The debtors negotiated and agreed to the

14  order that they placed before you.  They knew this

15  was going to be an issue.  They negotiated and

16  agreed to this order, and this order is very

17  specific in time frames.  It sets forth deadlines

18  that exterminate at the conclusion of the trial,

19  and, importantly, the order also gives the

20  committee, not the debtors, the right to seek leave

21  to extend those time frames.

22         Actually, Your Honor, I think I may have

23  just misdirected you.  That is the order extending

24  time.  You signed an order on or about June 1st,

25  which contains the provisions that I just mentioned.

          OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

```
 1              THE COURT:  Okay.

 2              MR. BALDINI:  So the debtors had this in

 3    front of them, had all these facts.  They agreed to

 4    an order.  They agreed to give us the right to set

 5    the deadlines and seek to extend them.

 6              What have they done in that time?  Well,

 7    it appears they haven't done a lot, except ask us

 8    for extensions of time.

 9              They mention that they filed their

10    complaint in November.  What they don't mention is

11    that they filed their complaint in November, largely

12    because we told them we would not extend the time

13    for the defendants to answer the complaint any

14    longer, and we agreed to do so, partially

15    conditioned upon the fact they would file the D & O

16    complaint.

17              THE COURT:  That they would file the

18    coverage complaint.

19              MR. BALDINI:  I'm sorry, Your Honor.  I

20    need to use Mr. Donovan's chart so I can keep these

21    straight.

22              THE COURT:  It's fine.  If one refers to

23    the D & O complaint, you could fall into one of two

24    different boxes.  I'd rather talk about coverage.

25              MR. BALDINI:  I'll call that one coverage,

           OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875
```

```
1    I'll call ours fiduciary duty.  I'll see if I can
2    keep it straight.
3            THE COURT:  There is someone on the phone
4    who is rustling papers in front of your phone, which
5    I have already instructed you to put on mute.  If
6    you don't put it on mute, and the next time I hear
7    sound, I will cut off the telephone.
8            Sorry, Mr. Baldini.
9            MR. BALDINI:  Thank you, Your Honor.
10           Now, the debtors' justification for this
11   request for an indefinite stay is insufficient to
12   warrant the granting of the stay under the law we
13   cited.  It comes basically down to, the outcome of
14   the coverage action may impact what we do in the
15   fiduciary duty action.
16           There is no indication of how it will or
17   when it will.  Frankly, I think if we were to talk
18   about it, I could speculate for you ways in which
19   our action will impact the coverage action.  It
20   already has.
21           Our unwillingness to extend deadlines in
22   large part caused the complaint to be filed.  Our
23   unwillingness to sit back and wait much longer has
24   caused the debtors to try to expedite the process.
25   You can already see that impact.
```

OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

```
1            Going to your last comment about bad faith
2    claims, et cetera, if I'm an insurer, I'm certainly
3    much more concerned about those types of claims when
4    I see the underlying fiduciary duty litigation going
5    forward and moving towards judgment.
6            Secondly, in our request for standing to
7    bring the action in the first place, we identified
8    potentially $500 million, give or take, of damages.
9    The insurance proceeds would amount to approximately
10   $100 million, if they were all satisfied.  So
11   there's other sources of recovery out there.  The
12   insurance litigation, coverage litigation, is
13   important, but it shouldn't be the determinative
14   factor in whether we should continue to sit and wait
15   and pursue these valuable claims.
16           All of these facts were known to the
17   debtors back in June when they negotiated and
18   consented to this order, which set forth these
19   deadlines.  We moved the time to answer, we've
20   worked with them, and we've extended it out into the
21   middle of January.
22           Finally, this case is going to be
23   prosecuted whether there's coverage or not.  We have
24   certain obligations with respect to the prosecution
25   of those claims, and I would fully expect that we
```

OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

1    would uphold those obligations.

2            The notion that we are going to do

3    scorched-earth litigation to pursue people who are

4    judgment proof is not realistic, and it also has no

5    factual basis, because it's based upon the testimony

6    of counsel.  There's no facts before you that

7    suggest that any single individual is judgment

8    proof.

9            If those individuals are judgment proof,

10   and we'll have to take that if and when it comes,

11   that does not make them immune from litigation.

12   We're going to have to take it as it comes.  That

13   was part of the deal when we were allowed standing

14   to prosecute these claims.

15           If, as the debtor says, the estate is

16   rapidly diminishing, that's all the more reason to

17   allow us to prosecute these claims as quickly and

18   expeditiously as possible.

19           Unless you have any other questions, I'll

20   wrap it up there.

21           THE COURT:  Okay.  Thank you, Mr. Baldini.

22           Mr. Donovan?

23           MR. DONOVAN:  Briefly, Your Honor.

24           First, the claim that somehow the debtors

25   have been sitting on their hands, when the committee

OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

1    sent its demand letter asking consent to standing,

2    that was December 2008, we provided that to both

3    Chubb and XL.

4            In February and March 2009, respectively,

5    both of those entities said there's no claim.  They

6    sent us a letter.  They said there's no complaint,

7    so we sent that to the committee.  The committee

8    then filed its complaint in June.  We then received

9    kind of tentative denials from both.  We provided

10   those to the committee, and the committee told us

11   they didn't think they were definitive enough, and

12   XL did not definitively deny coverage until

13   September of '09.

14           So any argument that we've been sitting on

15   our hands -- I apologize, but we actually met with

16   them before we sued them, and then I think this week

17   they were upset we were too prepared to sue them,

18   because within two days we sued them after the

19   meeting.

20           THE COURT:  I'm sorry their feelings were

21   hurt.

22           MR. DONOVAN:  We asked them for the final

23   meeting and we had it.

24           With respect to the order and their cases,

25   this morning I told you about the Ortega case and

          OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

1   the other case.  Their other case had to do with

2   whether or not you should stay a proceeding during

3   some other proceeding that was before the U.S. Iran

4   Tribunal.  This is not the U.S. Iran Tribunal.  All

5   these cases are before you.

6          THE COURT:  The U.S. Iran Tribunal and the

7   Hague did its work slowly, but thoroughly.

8          MR. DONOVAN:  This is just a different

9   situation.  The committee is right.  They can come

10  back to you at any time.  This is going to continue

11  to be in your discretion.  That's why the courts

12  look at it differently when the cases are before

13  you.

14          With respect to the recovery, they did say

15  500 million.  They're recovering 400,000 in the

16  fraudulent conveyance action, which leads to

17  $100,000 in proceeds, I believe they were referring

18  to.

19          Finally, with respect to the wording, I

20  will take the creditors' committee's wording, in

21  order to avoid any issues they're concerned about,

22  but I actually think we're not going to need as such

23  time as they put on there, to get to at least the

24  fees issue.  Then you're not damaging the estate or

25  damaging individuals, which I think you're allowed

          OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

1   to take into account, in this economy, and these

2   individuals who have been laid off from a company

3   they worked hard for.  It may not have succeeded,

4   but they worked hard for it.  We don't think that's

5   right.

6           Thank you, Judge.

7           THE COURT:  Thank you, Mr. Donovan.

8           I am sympathetic to defendants in

9   fiduciary duty litigation who, with insurance

10  coverage apparently there, are nonetheless denied

11  the benefits of the defense costs portion of that

12  coverage.

13          I say that with particular emphasis in

14  respect of lower level employees who were directors,

15  perhaps more as a matter of convenience for

16  somebody, than with actual independent authority to

17  act.  I'm not making any rulings or determinations

18  here in respect of obligations, rights and duties,

19  but only making an observation as one human being

20  looking at a set of difficult circumstances.

21          My conclusions about the fraudulent

22  transfer transaction are out there for the world to

23  read, and as part of that, I certainly reached some

24  conclusions as to the decision-making processes

25  internally at the company, and the motivations for

           OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

1    some of those decisions.

2           Obviously, the individuals involved are in

3    no position to defend themselves in the fraudulent

4    transfer action, and they will not be bound by those

5    findings in the fiduciary duty litigation, but the

6    facts are the facts, and if the same facts are

7    presented, they may be colored differently, and

8    there may be other facts presented that I haven't

9    heard yet, that could substantially change my views,

10   but it is to me difficult to understand how in good

11   faith coverage has been denied.

12          We'll save that for another day.  Unless

13   there's some remarkable provision in the insurance

14   policies that excludes coverage for the acts that

15   are complained of, I do not understand the theory by

16   which coverage and defense has been denied.

17          Having said that, the issue obviously

18   needs to come on for hearing, which I expect it to

19   be done rapidly.

20          Because I think it can be done rapidly, I

21   am inclined to grant the motion in part, and grant a

22   stay, which would, among other things, obviate the

23   need for the filing of responsive pleadings now

24   scheduled for January 11th, but not to do so for

25   very long.

OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

1        Which gets me to the time questions.  We

2    have hearings on January 29th in TOUSA.

3        What are those hearings on?  Does anybody

4    know?

5        MR. SUSSBERG:  Your Honor, I believe it's

6    just an omnibus hearing date.

7        THE COURT:  You're going to have,

8    Mr. Donovan, responsive pleadings from the insurance

9    carriers December 11th.

10       MR. DONOVAN:  Correct.  We have a status

11   on the 29th of December.

12       THE COURT:  Status on the 29th in that

13   litigation?

14       MR. DONOVAN:  In the insurance litigation.

15       THE COURT:  Okay.  What do you anticipate

16   you will do once you have the answers in hand?

17       MR. DONOVAN:  We'll respond to any

18   motions.  Regardless if they -- we're going to try

19   to get to the merits.  End of the month, early

20   January, I think that would be briefed, and

21   hopefully heard by Your Honor mid, late February,

22   with a ruling mid-March.

23       So I'm thinking if we have another

24   status -- obviously, each time, but the key one for

25   this stay would be in April, you can then address

     OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

1    this schedule.  Maybe the parties can even work out

2    an agreed schedule by that point.  That's just a

3    proposal, Your Honor.

4              THE COURT:  Mr. Baldini, talk to me about

5    timing.

6              MR. BALDINI:  Your Honor, April sounds an

7    awful lot like a year and a half since this issue

8    came up.  Then we start getting very much into the

9    issue of overbroad, unconscionable, speculative,

10   what else could go on between now and then that

11   would cause us not to get to a ruling on that.

12             We don't know yet whether the insurance

13   companies are going to answer, move to dismiss, move

14   for summary judgment, seek discovery, et cetera.

15   Sounds like an awful long time to wait, when as I

16   said before, I believe that our litigation is a

17   substantial motivating factor to getting that

18   moving, and has substantial benefits for the estate

19   in getting a recovery.

20             The damages between our case and that case

21   are not overlapping necessarily.  In fiduciary duty

22   claims you can get punitive damages.  Those are

23   valuable claims for the estate.  I think we need to

24   move quicker.

25             THE COURT:  We have a hearing on

         OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

1    December 29th on status conference in the coverage

2    litigation.  What is the hearing on January 11th in

3    TOUSA?

4            Is that just a general day, Mr. Sussberg?

5            MR. SUSSBERG:  I believe so, Your Honor.

6    I could check and get back to you on that.  I

7    believe it's just another holding day for omnibus

8    matters.

9            THE COURT:  Do you expect, Mr. Donovan.

10   that whatever motions you intend to file will be

11   filed before the end of the year?

12           MR. DONOVAN:  I think right around that

13   period, whether it's the end of the month or the

14   beginning of January.

15           I'm sensitive to Mr. Baldini's concerns,

16   but I think a couple of points, there's other ways

17   to get to the fact that they cover defense costs,

18   rather than the stay that they agreed to before,

19   which was the end of the trial.  We're not

20   anticipating that.  Under the new rules, we don't

21   even need to wait for their answers to file for

22   summary judgment.  That's one of the changes here.

23           In addition, there's other avenues -- I've

24   been told, because I'm not an insurance litigator

25   either -- to join this issue.  I hope the insurers

OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

1    want to join it just to find out which one it is.

2    So we're --

3              THE COURT:  Or maybe it's both.

4              MR. DONOVAN:  We can all work together to

5    move that.

6              I would suggest what you originally said,

7    January.  We could see where we're at, and then

8    basically set a schedule at that point.  You can

9    reassess.  They can make argument it's taking too

10   long.  I can say why we're moving ahead.

11             I think the incremental approach is the

12   right way to view this.

13             THE COURT:  Okay.  I'm going to set a

14   status conference in this litigation, the fiduciary

15   duty litigation, for January 29th, and I'm going to

16   reserve that day, Mr. Donovan, for argument on any

17   motions that you may file in the coverage

18   litigation.

19             Mr. Sussberg, how much of January 29th do

20   you anticipate the general case will require?

21             MR. SUSSBERG:  In thinking about what we

22   scheduled January 29th for, it relates to the motion

23   that we filed earlier this week to sell TOUSA's

24   Florida division.  We will be before Your Honor on

25   December 16th with bidding procedures in connection

            OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

1   with that sale, and we have scheduled January 29th

2   for the final sale hearing.

3           THE COURT:  I wouldn't anticipate that's a

4   bloody event, would you?

5           MR. SUSSBERG:  I certainly would hope it's

6   not.

7           THE COURT:  Mr. Dublin?

8           MR. DUBLIN:  The committee has been fully

9   involved in the Starwood transaction, as we've come

10  to call it.  We don't expect there to be any issues

11  either with the bidding procedures or the final sale

12  agreement on the 29th.

13          THE COURT:  Why don't we set status

14  conferences and motion arguments in this case and

15  the insurance coverage case for 11 o'clock on

16  January 29th, with the expectation that it will go

17  into the afternoon, and the rest of the day will be

18  reserved?

19          MR. DONOVAN:  Just for clarification, Your

20  Honor, can I tell the individual defendants that

21  they don't need to appear?

22          THE COURT:  They do not need to appear.

23  They're certainly welcome to appear, their counsel

24  are welcome, but they don't need to attend.

25          I will consider what timing I would

1   anticipate for an answer date, and other things to

2   progress in the fiduciary duty litigation at the

3   hearing on January 29th.

4          MR. DONOVAN:  Understood.

5          THE COURT:  I think that will give me an

6   opportunity to have the lay of the land layed out.

7          MR. DONOVAN:  Can I make one more request?

8          THE COURT:  Yes, sir.

9          MR. DONOVAN:  They're not here, so we'd

10  have to do it separately.  I'd ask you to consider

11  in the insurance litigation potentially -- I know

12  we're moving fast, but also ordering mediation or

13  something.  That's for another day, but I ask that

14  you consider it.

15         THE COURT:  If you were to file a motion

16  to that effect in a timely basis, I'd consider that

17  on December 29th.

18         MR. DONOVAN:  Okay.  Thank you, Your

19  Honor.

20         THE COURT:  You're welcome.  I do think

21  that mediation makes sense, and frankly, I would

22  have thought that the fraudulent transfer action

23  would have made more progress in settlement than it

24  did before the entry of judgment, and I think that

25  at the end of the day, the fiduciary duty action and

            OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

1 the fraudulent transfer action probably, in order

2 for them to be resolved without going to the end of

3 time and processing of appeals, people ought to be

4 locked in a room somewhere and required to sit with

5 principals until something is resolved, or it

6 becomes clear that nothing can be resolved.

7     This stuff can go on forever, and we can

8 have a wonderful time as litigators beating our

9 heads against the wall, but at the end of the day,

10 I'm not sure whether that is a wiser course of

11 action than seriously considering what the exposures

12 are.

13     So if you were to file a request for

14 mandatory mediation, it would be viewed favorably.

15     MR. DONOVAN:  Thank you, Your Honor.  Do

16 you want us to submit an order?

17     THE COURT:  Give me an order, Mr. Donovan,

18 that grants your motion for stay, continues the stay

19 through the hearing on January 29, 2010, extends to

20 a date to be set at that hearing the responsive

21 pleading date in the fiduciary duty action.

22     I'm not sure it needs to say much more

23 than that.

24     Mr. Baldini, does it need to say much more

25 than that?

   OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

49

```
 1              MR. BALDINI:  I don't think so, Your

 2   Honor.

 3              MR. DONOVAN:  We'll obviously circulate

 4   it.

 5              THE COURT:  Is there anything else we need

 6   to do today?

 7              MR. DONOVAN:  Not from the litigation

 8   perspective.

 9              THE COURT:  Thank you all.  We're

10   adjourned.

11              (Thereupon, the hearing was concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875

```
 1
 2                      CERTIFICATION
 3
 4    STATE OF FLORIDA:
 5    COUNTY   OF   DADE:
 6
 7                     I, HELAYNE F. WILLS, Shorthand Reporter
 8    and Notary Public in and for the State of Florida at
 9    Large, do hereby certify that the foregoing
10    proceedings were taken before me at the date and place
11    as stated in the caption hereto on Page 1; that the
12    foregoing computer-aided transcription is a true
13    record of my stenographic notes taken at said
14    proceedings.
15                     WITNESS my hand this 7th day of
16    December, 2009.
17
18
19                     _____
                              HELAYNE F. WILLS
20                       Court Reporter and Notary Public
                       In and For the State of Florida at Large
21                     Commission No:  DD887579  Expires:  8/2/13
22
23
24
25

          OUELLETTE & MAULDIN COURT REPORTERS  (305)358-8875
```